The People of the State of Illinois, Plaintiff-Appellee, *v.* Darrell Dillard *et al.*, Defendants-Appellants.

(No. 70-99;

Fifth District—June 2, 1972.

Hillebrand, Cook & Stiehl, of East St. Louis, (Robert J. Hillebrand, of counsel,) for appellant Darrell Dillard.

Kenneth L. Gillis, of Defender Project, of Chicago, for appellant Hubert McCray.

Robert H. Rice, State's Attorney, of Belleville, (Kenneth J. Juen, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE CREBS delivered the opinion of the court:

In a bench trial in the Circuit Court of St. Clair County defendants, Hubert McCray and Darrell Dillard, were convicted of murder and were sentenced to the penitentiary for terms of not less than 14 nor more than 50 years. Their separate appeals have been consolidated here for opinion. The principal contention in each appeal is that the homicide was committed in self defense and that the State failed to overcome such evidence by proof beyond a reasonable doubt.

Edward Brock, a gas station attendant, was shot and killed shortly after 10:00 o'clock in the evening on May 9, 1969, in East St. Louis. A fellow employee, John Warzala, testified that that evening, as was customary, he and Brock secured the station, turned off the lights and started to go home. As they walked to their cars at the side of the station Brock said he was going to check the store room first and Warzala noticed that Brock was then carrying a gun and that he shifted what looked to be a black .22 caliber gun from his left to his right hand. A few seconds later Warzala heard a number of shots. He saw no one nor did he hear anyone say anything prior to the shots. He stated that he was so scared he took off and ran down the street where he hailed a passing squad car. Two police officers testified that as they were cruising past the station they too heard the shots and saw Warzala running and calling for help. They parked their car, ran back towards the station, and, from about 60 or 65 yards, one of them fired his shot gun once at what he thought to be men running. Brock was found in back of the station in a sitting position leaning against some pipes and bleeding profusely. He was taken to the hospital, but he died before regaining consciousness.

Medical testimony revealed that Brock had been shot four times and

that his death was caused by a bullet wound in his abdomen which severed his left iliac artery. A second bullet had grazed his forehead, a third had entered his right arm and a fourth had entered his left cheek. Ballistics testimony established that the bullet recovered from Brock's abdomen was fired from defendant, McCray's .38 caliber gun. Of three bullets recovered, one was identified as coming from defendant Dillard's .22 caliber gun. One was so mutilated it could not be identified other than as coming from a .22 caliber gun, and one was admitted to have come from Brock's gun and to have been recovered from Dillard's arm.

The defendants and other boy, Gregory Anthony, were arrested later that night at a hospital where they had gone for treatment of two gunshot wounds incurred by defendant, Dillard, one in the left shoulder and one in the right elbow. When questioned, all three told the same story, that Dillard had been shot by an unknown assailant on his way home from school and that he had called McCray and Anthony to take him to the hospital. Locked in the trunk of McCray's car police found both guns of the defendants and also decedent's gun. McCray's gun contained four spent shells, Dillard's six, and the decedent's one.

Gregory Anthony was not indicted but was presented as an eye witness by the State without vouching for his veracity. He testified that he was 22 years of age and a student at SIU in East St. Louis. He and the defendants had been friends for a number of years. On the night of the shooting they went to Dillard's house at about 8:00 P.M. and while sitting and talking they drank a six pack of beer. A little before 10:00 P.M. they picked up another six pack at a store and drank five of these while riding in McCray's car. At the suggestion of McCray they stopped across from the gas station in question to relieve themselves. The station was dark and apparently closed so they went in the back by the alley between a fence and a large dumpster where they could not be seen. While they were urinating all of a sudden a shot was fired at them without any call or warning. He stated that Dillard then pulled out his gun and shot and that Brock grabbed Dillard and pulled him to the ground. They were struggling and when Dillard called for help, he and McCray tried to pull them apart. He did not know how many shots were fired but finally he and McCray ran back to their car and Dillard followed. They drove a short distance away and stopped to see how bad Dillard was hurt. Then they went to a hospital, parked in the front parking lot and went to the emergency room. Before following Dillard into the hospital Anthony said he put the guns in the trunk of the car. He admitted that both he and the defendants told the police that Dillard had called them to take him to the hospital, and that they did not tell the truth about being

involved in the shooting because they did not think the police would believe what had happened.

Decedent's wife also testified for the State. She identified her husband's gun and stated that he always carried it. On this particular day she remembered she had taken it from the dresser and handed it to him before he left for work and that it was fully loaded.

Defendants presented a number of witnesses who stated that the general reputation of each of them for truth and veracity was good, that they were peaceful and law abiding citizens who had never before been in any trouble. Defendant Dillard testified that he was 22 years old, that he had received an honorable discharge from the army, that he had never before been accused of or been arrested for anything, and that he was in a teacher training program at SIU. He stated that the situation in East St. Louis was bad and tense at this time, that there were many shootings and beatings, and that he himself had been shot at once before while walking down the street. He said he bought the gun the last of March to protect himself and that he carried it all the time. It had five cartridges in it when he bought it, he never purchased any more, and at the time of the shooting it had only three live cartridges as he had shot it twice to make sure it would work. His testimony was essentially the same as Anthony's relative to their activities prior to the shooting. As they were urinating a shot was fired wholly without warning and it hit him in the arm. He said he spun around, pulled his own gun and fired once. Brock then grabbed him and they wrestled and he got shot again in the shoulder and his own gun went off twice more. McCray and Anthony tried to help, but they finally ran and he did too, after picking up Brock's gun from the ground because he was afraid Brock might pick it up and shoot him again. At the hospital he admitted they made up the story about being shot by a sniper because they did not think the police would believe the true story.

McCray testified that he had recently received his honorable discharge from the army, that he had never before been accused of or arrested for anything, that he was working to get money to go back to school in the fall. He stated that he bought his gun on May 8th because he had been told how rough it was in East St. Louis and he wanted it for protection. He too had never bought any additional cartridges. He had test fired the gun three times, and on the night of the shooting it had only one live cartridge in the chamber. He stated that while they were urinating a shot came from nowhere without warning, and when Brock and Dillard were struggling he tried to knock the gun out of Brock's hand and that is when it went off. He said he was scared and that he and

McCray tried to help pull Brock and Dillard apart but when he heard more shots he ran back to the car. He stated that he and Anthony put the guns in the trunk and that they made up Dillard's story because they were afraid they would not be believed.

The State contends that the above facts prove defendants guilty of committing a felony murder which was the theory upon which they were indicted, tried and convicted. It is argued that Dillard admittedly took Brock's gun and that that in itself constituted robbery, and that further evidence of robbery was the fact that after the shooting Dillard must have rifled Brock's pockets because a key and pocket knife belonging to Brock were subsequently found on the ground within four inches of Brock's body. In the State's brief, it is stated that "[T]his clearly substantiates the State's theory of why they came on the premises". This argument seems to be made to avoid the necessity of complying with the statutory requirement that where an affirmative defense of justifiable use of force is raised then the State must sustain the burden of proving a defendant guilty beyond a reasonable doubt as to that issue together with all other elements of the offense. Ch. 38, Sec. 3-2 and Sec. 7-14, Ill. Rev. Stat.

It is true, as stated in *People v. Sullivan*, 345 Ill. 87, a burglar rifling a safe who is confronted by the owner with a drawn revolver has no right to shoot the owner because his life is in imminent danger if he does not, and a robbery whose command "Hands up!" is answered by a shot from his victim's gun has no right to kill the latter to save his own life. But the situation before us is not so clear cut. The trial court specifically found that there was no true evidence of felonious intent here. He found that defendants, and their friend, Anthony, had good reputations, that they had reached an age where they were close to maturity without in any way being a law violator, and that men do not normally adopt a life of crime overnight. We too find no evidence of felonious intent. The State's argument that defendants intended to rob Brock presupposes, without any evidence whatsoever, that defendants knew of Brock's presence, or of someone's presence, on the darkened and closed service station premises. Also, in our opinion, the finding of decedent's key and pocket knife within four inches of his pocket does not reasonably lead to the conclusion that his pockets were rifled. Nor does the taking of his gun by Dillard prove an intent to rob. More reasonable are the inferences that the key and knife fell out in the struggle, and, as claimed by Dillard, that he took the gun to keep Brock from shooting him again as he fled. We find that the inferences drawn by the State are wholly insufficient to prove a felony murder beyond a reasonable doubt

and it is therefore necessary to consider defendants' claim that the killing was committed in self defense and was justifiable.

■■■ It is settled law that the burden of proof never shifts to the defendant, no matter what his defense may be, and where he pleads self defense, it is sufficient to acquit him, if his evidence on self defense, together with all other evidence in the case, creates a reasonable doubt of guilt. (*People v. Williams* (1959), 56 Ill.App.2d 159.) As stated in the same case the elements necessary to justify the use of force are, (1) that the person threatened is not the aggressor, (2) that danger of harm is imminent, (3) that the force threatened is unlawful, (4) that the person threatened must actually and reasonably believe that danger exists and use of force is necessary to avert the danger and, (5) that in the use of deadly force the threatened force must be such as will cause death or great bodily harm.

■■■ Of these elements the sole point at issue is the sufficiency of proof as to whether the decedent or the defendants were the aggressors. Having found no evidence that defendants entered upon the station premises with a felonious intent, and handicapped by a scarcity of facts other than the testimony of defendants and Anthony, the trial court indulged in a number of hypotheses and concluded that defendants and not decedent fired the first shot and that the killing, therefore, was not justified. The State quotes at length from the trial court's remarks and relies almost entirely upon his reasoning, We likewise, shall give full consideration to the court's findings with awareness of the principle that the issue of self defense is ordinarily one of fact and that a verdict should not be disturbed unless the evidence is palpably contrary to the verdict or so unsatisfactory as to justify entertaining a reasonable doubt of guilt.

■■■ First we believe it necessary to determine the status of the parties and their relative rights and duties. Unquestionably, the defendants were trespassers upon the property of the owner of the premises. By statute (Ch. 38, Sec. 7-3, Ill. Rev. Stat.) the decedent as a representative of the owner had a right to use reasonable force to terminate the trespass, but, in the absence of preventing a forcible felony, he was not entitled to use such force as was intended or likely to cause death or great bodily harm. However, as a corollary, when confronted by imminent danger of death or great bodily harm even a trespasser may take the life of his assailant in defense of his own, and he does not lose this right of self defense by the fact that at the time he used a weapon which he was carrying without a permit or contrary to law, (40 Am.Jr.2d, Homicide, Sec. 141 and 143; 10 ALR 861). (See also *People v. Doody*, 343 Ill. 194.) As stated in *State v. Doris*, 51 Or. 136, 94 Pac 44, "* * *

to hold that the mere fact that a person accused of homicide was armed at the time, and that because of his misdemeanor resulting therefrom he shall be deprived of any right of self defense, would lead to the absurd and unjust consequence, in practically all cases, of depriving the accused of any defense, whether such person is in the right or wrong, and whether his acts were necessary to save his life or to avoid receiving great bodily injury or not". Further, it was stated that a jury has a right to take into consideration the fact that defendant was carrying a pistol only insofar as that incident was connected with the homicide. In *People v. Doud*, 223 Mich. 120, 193 N.W. 884, it is stated that no man may, in defense of his mere land against trespassers, assault the invaders with a dangerous weapon for the law forbids such a menacing of human life for so trivial a cause. In *Davison v. People*, 90 Ill. 221, it was held that an owner must first request or notify a trespasser to depart before he will be justified in the use of force; that the law affords ample redress for trespass but does not sanction the taking of life to prevent it; that when an owner carries resistance to excess and uses more force than is necessary, he becomes the wrongdoer. See also the annotation in 25 ALR 508.

In the case before us there is no evidence whatsoever that anything was said by either the defendants or the decedent prior to the start of the shooting, and one of the State's witnesses, who was within hearing distance, specifically stated that he heard no conversation, only a flurry of shots. It is also undisputed that the decedent was armed, that he always carried a gun, and that he shot one of the defendants. Specifically calling attention to the fact that the case was a difficult one to decide, the trial court proceeded to state the reasons for his decision. He found that it was not reasonable to believe that the decedent would open fire without challenging the defendants or questioning their authority to be on the premises. But this is a gratuitous assumption with nothing in the record upon which to base it. Contrariwise, and based on the Court's own finding that defendants had not entered upon the premises with felonious intent and had grown to maturity without a blemish on their records, it is most unreasonable to believe that they would have opened fire upon decedent without warning and without apparent cause. The court found further that it would be "more likely", "more probably" that the reactions of men who went there for peaceful purposes would be to dive for cover, to call to the attendant to try to explain they were not there to rob or harm him, and to beg him to cease fire. This is a double assumption both of which are ungrounded on any facts. It is premised first on the assumption that the defendants did not go on the premises for peaceful purposes, and second, on the assumption that because they did not go on the premises for peaceful purposes they, therefore, did not dive for cover.

Since the court already found that there was no evidence that entry was made with felonious intent it can hardly be assumed that the entry was for other than peaceful purposes. Further, as pointed out above, a trespasser need not dive for cover when confronted with deadly force, but may defend himself. To assume guilt for defending oneself is to deny the very right of self defense itself.

Finally, the trial court found that guilt was indicated by defendants' flight from the scene, their failure to report to the police or go to a closer hospital, their first-told false story, and the fact that the guns were placed in the trunk of the car. Under all the circumstances of this case such factors may or may not indicate guilt. It is always difficult to assess the meaning of another's actions, particularly when they were performed under stress following a frightful experience. If the incident occurred as defendants claim then flight from an unknown and dangerous assailant was in order, choice of hospital was merely personal, and failure to inform the police immediately, putting the guns in the trunk and making up a story could all have been dictated by fright and the realization of their unusual predicament. Such facts when tied together merely by "indications", "likelihoods", "probabilities" and ungrounded assumptions do not, in our opinion, add up to proof of guilt beyond a reasonable doubt. Unfortunately, both decedent and defendants found it necessary, under existing conditions, to carry loaded guns for personal protection. A death resulted and the victim could just as well have been one of the trespassers. ■■ After much reflection, and restricting ourselves to the facts presented and the reasonable inferences to be drawn therefrom, we find that the State failed in its burden of proof and that the evidence was so unsatisfactory as to give rise to a reasonable doubt of defendants' guilt. The judgment of the Circuit Court of St. Clair County as to each of the defendants, Hubert McCray and Darrell Dillard, is therefore reversed.

Judgments reversed.

G. MORAN, P. J., and EBERSPACHER, J., concur.