THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HAROLD EDGAR HALLEY, Defendant-Appellant.

(No. 73-16; ▮▮▮▮▮▮)

Fifth District—August 20, 1973.

Dick H. Mudge, Jr., of Edwardsville, (Paul David Kelley, of counsel,) for appellant.

W. C. Spomer, State's Attorney, of Cairo, (William F. Meehan and Ralph J. Mendelsohn, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE CREBS delivered the opinion of the court:

In a jury trial in the Circuit Court of Alexander County, defendant, Harold Edgar Halley, was convicted of murder and unlawful use of weapons for which he received concurrent sentences to the penitentiary of not less than 18 years nor more than 45 years for murder and one year for unlawful use of weapons. The main thrust of this appeal is that defendant acted in self-defense and was not proven guilty beyond a reasonable doubt.

The incident occurred at about 3:45 A.M. on May 4, 1972, in a tavern owned by the decedent, Mearl Chamness, and located on the outskirts of Cairo. Other than defendant the only eyewitness was the wife of the decedent, Marlene Chamness. Previously she had been married to defendant for sixteen years, had divorced him in September, 1969, and had married decedent on April 27, 1972. The argument precipitating the shooting involved the children of defendant and Mrs. Chamness, two boys 12 and 16 years of age.

Mrs. Chamness, testifying first as a witness for the State and then as the Court's witness, stated that for some time prior to her marriage she had lived with the decedent in his apartment above the tavern; that

though she had been awarded custody of the children she was reluctant to have them live with her as the only entrance to the apartment was through the tavern. She did visit them occasionally as defendant's trailer home, but her husband objected to this and finally forbid her to continue the practice. On the night of the shooting defendant had come to the tavern to talk over the problem with her and her husband. She had had a conversation with defendant earlier in the evening, and then he had waited until closing time, about 3:15 A.M., to talk with her husband. When everyone had left the tavern the three of them sat at the bar and talked until 3:45 or 4:00 o'clock. Suddenly, she said, the decedent moved about eight feet towards the bar cooler where he kept his gun, grabbed it, and turned around and shot twice at defendant. She immediately ran to an adjacent hallway and did not see defendant return the fire, but she did hear several shots. When she returned defendant was seated in the same place he had been; his gun was on the bar, and her husband was lying immobile on the floor behind the bar. Defendant told her to call the sheriff, but when she was unable to complete the call defendant himself called. Two deputies arrived about 30 or 45 minutes later. She also testified that in her opinion her husband was intoxicated.

The defendant testified that he had offered to keep the children until his former wife and the decedent found suitable living quarters; that the decedent refused to allow Mrs. Chamness to visit his trailer so defendant suggested that both of them could come and he would leave while they were there, but decedent refused to accept this arrangement. About two days prior to the shooting, when defendant brought the boys to the tavern and asked their mother to take them to the dentist for a previously set appointment, he said the decedent became obnoxious for the first time and said, "All I can tell you is to get heeled." Then, on the night in question, defendant said he went to the tavern to discuss the problem again because the youngest boy thought his mother had left him. Decedent asked him to wait until closing time. When everyone had left they started to talk, but again the decedent insisted that under no circumstances would he permit his wife to visit defendant's trailer. Finally, defendant asked to be let out of the tavern (the door having been previously locked at closing) and as the decedent got up and started to move from his seat behind the bar he, the decedent, grabbed a gun and "turned in a sidewise fashion and shot at me directly." Defendant jumped off his bar stool, ducked down and fired three shots at decedent. Decedent then seemed to stoop down or stumble, but when defendant saw decedent's gun hand come up above the

bar again he shot twice more. Defendant said he shot only in self defense, stating, "That when a man shoots at you point blank he has full intention of killing you."

The State presented a number of witnesses. The two deputy sheriffs who responded to defendant's call testified that when they arrived Mrs. Chamness informed them that her husband had started it, not defendant, and the "* * * no-good son of a bitch got what he deserved." The defendant told them that "* * * the man pulled down on me and took a couple of shots at me and I had to defend myself." Defendant pointed out his gun to them and they found that it had five spent cartridges. Decedent's gun was recovered near his body behind the bar and it had two spent and four live cartridges. On cross examination it was brought out that neither officer had mentioned Mrs. Chamness' alleged remarks about her husband getting what he deserved either at the coroner's inquest or in their statements to the state's attorneys' office on the day of the incident.

The bartender, who had left the tavern at about 3:15 A.M. and had locked up, testified that about two weeks previously he had overheard defendant say that he was going to get decedent, and that on the night of the shooting he had seen defendant hold a gun on decedent, but that he could not hear what was said. On cross-examination he admitted that when he was interviewed by the state's attorneys' office on the day of the shooting he had not mentioned this latter incident. Two other witnesses also stated that about two weeks prior to the shooting they had heard defendant say he was going to kill decedent. However, prior to the day of trial neither of them had reported such threats, not even to the decedent or his wife.

State crime laboratory technicians testified that the bullet causing the death came from defendant's gun and that five spent cartridges also came from his gun. Two bullets, one recovered from the ceiling and one from the wall across the room from the bar, were identified as coming from decedent's gun. The physician who performed the autopsy stated that decedent was hit with three bullets and that he was killed by the one that entered in from the front, under the left arm area, and went towards the back slightly, exiting under the right arm area. Another witness testified that blood tests showed that decedent's blood contained only .03 per cent alcohol and that he was not intoxicated.

■■ In support of defendant's conviction the State cites a number of general principles with which we agree. The issue of self defense is a question of fact for a jury under proper instructions, and a jury's decision on that issue will not be disturbed unless the evidence is so unreasonable, improbable or unsatisfactory as to suggest a reasonable

doubt. (*People v. Sustak*, 15 Ill.2d 115.) Where evidence is in part circumstantial a conclusion that defendant is guilty beyond a reasonable doubt need not follow necessarily from the proven circumstances, but may be obtained therefrom by probable deductions. (*People v. Kelley*, 29 Ill.2d 53.) A jury is not required to accept a defendant's account of the events as conclusive but may consider surrounding circumstances and the probability or improbability of the matters testified to by the defendant. *People v. Watts*, 101 Ill.App.2d 36.

■■ These principles must, of course, be applied to the facts of the individual case under consideration, and always with the overriding principle in mind that once the affirmative defense of self defense is interposed, the burden of proving guilt beyond a reasonable doubt as to that issue, as well as all other necessary elements of the offense, is placed on the State. (*People v. Graham*, 2 Ill.App.3d 1022.) As stated in *People v. Dillard*, 5 Ill.App.3d 896, the burden of proof never shifts to the defendant, and, where he pleads self defense, it is sufficient to acquit him, if his evidence, together with all other evidence in the case, creates a reasonable doubt of guilt.

In the case before us the only element of justifiable self defense at issue is whether decedent or defendant was the aggressor, and it is this issue that the State was obligated to prove beyond a reasonable doubt. To sustain this burden the State has cited the general principles above mentioned and argues that the improbabilities of defense testimony, and the surrounding circumstances, all lead to the reasonable conclusion that defendant was the aggressor and that his act constituted murder. It is contended that the only eye witness to the "murder" was defendant, as Mrs. Chamness did not see defendant fire his gun. But this ignores the very crux of the question, for Mrs. Chamness did testify that she saw decedent fire twice at defendant without any apparent provocation and then, only after she ran to the hallway, did she hear defendant's return shots. If this is true then defendant had a right to use a deadly weapon in self defense with intent to kill and yet not be guilty of murder. (*People v. Taylor*, 3 Ill.App.3d 734). Her credibility is questioned because she stated that decedent had been drinking heavily for several days and was intoxicated, whereas subsequent blood tests showed him to be sober. However, it appears to us that this discrepancy has little, if any, probative value and the State has failed to point out any. Attention is called to the fact that one of decedent's bullets entered the ceiling at an angle indicating that he was in a position different from that testified to by defendant and Mrs. Chamness, but no mention is made of the other bullet which entered the wall directly back of defendant. Also, a reasonably probable explanation of

this fact was offered by defendant when he stated that decedent's gun jerked upward after the first shot. Much is made of the contention that decedent was shot in the back, but even that is questionable for the physical evidence establishes that the bullets entered and exited from the sides of decedent's body; and the shot that killed him entered from the front, under the left arm area and went towards the back slightly, exiting under the right arm area. It is stated further that neither the defendant nor Mrs. Chamness attempted to help decedent after he was shot, but there is no evidence that any assistance would have been helpful; and they did call the sheriff's office immediately. Finally, the State cites the "threats" which defendant allegedly made on decedent's life approximately two weeks prior to the killing and the bartender's testimony that he had seen defendant pull a gun on decedent sometime earlier in the evening. Such incidents may or may not have occurred, but they were never mentioned to anyone prior to the day of trial even though each witness had previously been interviewed by the State. In any event, in view of all the circumstances they too have little probative value on the question of who was the first to resort to violence and start shooting.

■■ In effect, the State's case rests almost entirely upon suspicion, conjecture and supposition. The only direct evidence of the shooting consists of the testimony of defendant and the other eye witness which in itself is not improbable, nor uncorroborated, nor contradicted in its material parts. In like circumstances, and with similar contentions made by the State, the court in *People v. Jordan*, 4 Ill.2d 155, commented as follows:

> "To support the judgment of conviction in this case, defendant in error argues that where defendant is the only person to testify for the purpose of establishing self defense, the jury is not compelled to accept defendant's statements but may consider the probability or improbability thereof, and the surrounding circumstances; and further that the reviewing court will not substitute its judgment for that of a jury because the testimony is conflicting unless, from a consideration of all the evidence, there is reasonable doubt of defendant's guilt.
>
> Implicit in the first part of the foregoing statement is that there is evidence in the record supporting a conclusion that the blow was unlawfully struck, or in other words, that there is a conflict in the evidence, or that there are at least two variations from which to choose, one of which could support a verdict of guilty. This is entirely wanting in this case. Here we have only one

version of what occurred when the two men met. It is the version of defendant, and if it is not improbable, nor uncorroborated, nor contradicted in its material parts, then the jury may not disregard or reject it, and if the jury, as in this case, does reject it, then such action must be regarded as the result of passion or prejudice of the jury. The rejection of defendant's testimony by the jury still does not have the effect of supplying proof of defendant's guilt beyond a reasonable doubt sufficient to sustain the conviction of defendant."

■■ We agree with this reasoning and find that the State's proof here is so unsatisfactory as to leave a grave and substantial doubt of defendant's guilt. Accordingly, the judgment of the Circuit Court of Alexander County finding defendant guilty of murder and unlawful use of weapons is reversed.

G. MORAN, P. J., and JONES, J., concur.