The People of the State of Illinois, Plaintiff-Appellee, *v.* Albert Brown, Jr., Defendant-Appellant.

(No. 56936;

First District (2nd Division)—May 14, 1974.

Arthur H. Grant, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago, for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Defendant, Albert Brown, Jr., was indicted on three counts of murder.[1] After waiving his right to a jury trial, he was found guilty on all counts, and was sentenced to consecutive terms of 31 to 100 years for the murders of Larkey Hudson and Eloise Haynes and a concurrent term of 31 to 100 years for the murder of David Young. On appeal defendant contends that he was not proven guilty beyond a reasonable doubt in that the evidence supports his allegations of self-defense and defense of habitation, or that at most the killings were voluntary manslaughter. In its brief, the State has confessed error as to the findings of guilty as to the murders of Larkey Hudson and David Young. The State maintains, however, that the evidence established beyond a reasonable doubt that defendant murdered Eloise Haynes, or at the very least, the evidence supports a finding of voluntary manslaughter in the shooting of Eloise Haynes.

On February 5, 1971, defendant and his girlfriend, Myrtle McDaniels, had lived together at 15 West 100th Street, Chicago, for approximately 1 year. On that date defendant left work and went to a tavern for a few beers. At approximately 6 P.M. he left the tavern and proceeded to a pawnshop located at 1335 Racine to pick up Myrtle who worked at the shop. An argument ensued between defendant, Myrtle, and Myrtle's brother, Henry Frison, the manager of the shop. Myrtle stated her intention of moving out of their apartment, and, accompanied by Larkey Hudson, David Young and Eloise Haynes, (Henry Frison's wife), she left the shop shortly after 8 P.M. Approximately 10 minutes later defendant left the shop and drove directly to the apartment. Defendant arrived at the apartment before Myrtle and her friends due to the fact that they had stopped to pick up two of Eloise's children, Anthony Frison and Beverly Haynes, to help move Myrtle's belongings.

Defendant proceeded to hide in a closet in the living room when he heard Myrtle and her friends arrive. Myrtle, Eloise, Beverly and Anthony walked into the bedroom while Hudson and Young remained in the dining room. Defendant emerged from the closet with a 12-gauge shotgun and shot Hudson and Young. Upon hearing the shots, Eloise Haynes opened the bedroom door and defendant also shot her.

At trial Myrtle McDaniels testified that she had observed a revolver in Hudson's possession that evening, and had also observed a revolver lying on the floor between Hudson's legs after he was shot. Hudson's wife testified that he was employed as a security guard and had in his possession his company revolver and his personal revolver when he left

---

[1] Ill. Rev. Stat. 1971, ch. 38, par. 9—1 (a)(2).

home that morning. A police officer also testified that he observed a .38-caliber revolver lying on the floor between Hudson's legs and a .32-caliber revolver lying on the floor near David Young. Both weapons were loaded but had not been fired. Defendant testified in his own behalf that at the pawnshop he had observed a gun on Young's person, and that Hudson was wearing his security guard uniform. The State concedes that this evidence corroborates defendant's testimony that Young and Hudson drew their guns and that he shot them in self-defense, and requests that defendant's convictions with respect to the deaths of Hudson and Young be reversed. Therefore, the sole issue is whether the evidence supports a conviction for murder or voluntary manslaughter as to Eloise Haynes.

Henry Frison testified as to the events in the pawnshop prior to the shooting. At 7:30 P.M. Myrtle unlocked the pawnshop door and allowed defendant to enter. Defendant and Myrtle then entered into a discussion which he could not hear, and defendant picked up Henry Frison's gun and pointed it at Myrtle and Henry. Defendant stated that he wanted to talk to Henry and they walked to the rear of the shop. Defendant then started out the door with the gun, and Myrtle told Henry to call the police. Henry instead talked to defendant and defendant gave him the gun and Henry locked it in the office. A woman in the shop telephoned Eloise Haynes, who arrived shortly thereafter. Young and Hudson were by that time already in the shop. On cross-examination Henry testified that he observed a gun in Myrtle's bag. He also related that he observed Myrtle with a knife in her hand. He stated that Myrtle had been holding his gun before defendant picked it up, but that there was no argument between defendant and Myrtle. Henry then admitted that Myrtle screamed at defendant and threw whisky in his face, and that he told both of them to "keep cool" but neither would listen. After Myrtle, Eloise, Hudson, and Young left the shop, defendant asked him to unlock the door and allow him to leave, but he tried to talk defendant out of leaving because his wife Eloise had told him to keep defendant there until they got back. Defendant left the shop approximately 2 minutes after Myrtle and her friends left.

Myrtle McDaniels testified as follows: On February 5, 1971, she had been drinking and was intoxicated. Defendant came to pick her up at approximately 8 P.M. She had a gun in her hand prior to the time defendant entered the pawnshop. Henry and defendant walked to the rear of the shop to talk and Henry then called her back. An argument and a "scuffle" ensued between defendant, Myrtle, and Henry. Henry told defendant and Myrtle that he wanted them to stop fighting and "get along better." Myrtle could not recall what was said, but stated that defendant picked up Henry's gun and pointed it at her, and Henry stood between

them. Myrtle admitted holding an open pocket knife, but denied threatening defendant in any way. She admitted that she was intoxicated and shouted and screamed at defendant. Someone in the shop telephoned Eloise Haynes who arrived shortly thereafter, and then Hudson and Young entered the shop. Myrtle decided to leave defendant, and Eloise asked Young to drive them to the apartment to remove Myrtle's belongings. Hudson stated that he would go along to help. Eloise asked defendant to wait at the shop until they returned and he said he would.

On the way to the apartment they stopped to pick up Beverly Haynes and Anthony Frison, both teenagers. When they arrived, Myrtle and Eloise went to the rear of the building to see whether defendant's car was parked there because Myrtle "didn't want any trouble." Myrtle did not have the keys to the front door of the apartment building, but a woman on the first floor opened the door for them. Myrtle entered her apartment first and the rest of the party followed her in. She, Eloise, Beverly, and Anthony immediately proceeded to the bedroom, and shut the door; Hudson and Young remained in the dining room. Myrtle testified that defendant kept the shotgun in its case and "usually" stored it in the bedroom. As Myrtle was removing the bed linens, she observed defendant's coat on the bed and defendant's empty shotgun case. At this moment she heard two shots. She pushed back the bed and told Anthony to hide behind it with her. Eloise told Beverly to stay in the closet. Myrtle heard Eloise open the bedroom door and then heard a third shot. Defendant entered the bedroom and told them to come out of hiding. Defendant, apparently out of ammunition, ordered Myrtle to find more shotgun shells. Beverly screamed that her mother had been shot and Myrtle went to Eloise's aid. Eloise had fallen in the dining room approximately 3 to 4 feet from the bedroom door. Myrtle observed Hudson and Young lying on the floor and a shotgun in defendant's hands. Defendant called the police and stated "You better get over here, I have already shot three, if you don't get here, I am going to shoot four more."

Beverly Haynes' and Anthony Frison's testimony as to the events at the apartment substantially corroborated Myrtle's testimony. Beverly testified that her Aunt Myrtle entered the apartment first and she was the last one to enter. She was in the bedroom closet when she heard two shots. She was coming out of the closet when her mother opened the bedroom door, was shot and fell on the bed. Defendant then entered the bedroom, pointed the shotgun at her and asked her where Myrtle was. Beverly told him that she was under the bed and defendant jumped on the bed and hit Myrtle with the shotgun. Defendant told Eloise and Myrtle to get up, and ordered them all into the dining room. Defendant

then called the police. On cross-examination Beverly stated that she "stayed all the time in the closet."

Anthony Frison testified as follows: when he heard two shots, he hid behind the bed and then heard another shot. He did not know what happened after he hid. Defendant entered the bedroom, stepped on the bed and told them to come out. Defendant hit Myrtle on the head with his shotgun, told her he should shoot her, and ordered her to find more shells. Defendant ordered them into the dining room, and at that time Anthony did not know that Eloise had been shot. Defendant called Henry Frison and told Anthony to relate what had occurred and also called the police.

Defendant testified in his own behalf that, when Myrtle had unlocked the pawnshop door for him, he observed that she was holding a pistol behind her and that she "wasn't happy." Defendant thought that he and Myrtle "were getting along all right." Henry asked defendant to talk with him in the rear of the shop, and told defendant that he and Myrtle were going to have to get along better. Henry called Myrtle and began talking to her. Myrtle still had the pistol behind her, and became "madder and madder" and began cursing. Defendant then was aware that she had been drinking. Eloise, Hudson, and Young arrived in the shop and Eloise told her husband Henry to keep defendant "locked up" in the shop until they returned. Myrtle threatened defendant with a hook-blade knife and with words, refused to allow him to leave and threw whisky in his face. Defendant stated on cross-examination that this did not anger him. Defendant also observed that Eloise had a gun in her coat pocket, and testified that he had known her to carry a gun "a couple of previous times." On cross-examination he testified that he saw the gun when Eloise pulled her hand out of her coat pocket before she left the shop. Five to ten minutes after Myrtle and her friends left, defendant was able to slip out of the shop when someone left the door unlocked. He drove straight to his apartment and called his landlord. He told him that people were on their way over to take "everything" out of his apartment and asked the landlord to call the police. The landlord told defendant to pack Myrtle's clothes and set them outside the door. Defendant then heard car doors slamming, and saw Myrtle and her friends approaching. Defendant testified that his first thought was to take his things and leave, but then he hid in the closet in the hope that they would take her things and leave.

While in the closet defendant heard one of the men ask Myrtle if he could have defendant's gun. Defendant emerged from the closet to tell them not to take any of his things. Before he could utter more than one word Hudson drew his gun. Defendant dove back into the closet and

picked up his loaded shotgun which was lying there. Defendant reemerged from the closet and walked into the dining room. Hudson again drew his gun and defendant shot him, Young had almost gotten his gun out of his pocket and defendant shot him, and Eloise, who was standing at the entrance to the bedroom, then reached her hand into her pocket and defendant shot her. Eloise did not fall but remained in the doorway and pushed defendant. Defendant cocked his shotgun and ordered the rest of the persons from the bedroom. Defendant called Henry Frison and the police. Defendant testified that Hudson was 3 to 4 feet from defendant, Young was 8 feet from defendant, and Eloise was 2 to 3 feet from defendant when the fatal shots were fired.

The police who arrived at the scene testified that they found defendant holding a shotgun. He surrendered the gun upon request and without resistance. Defendant orally stated that he shot three persons in self-defense—Hudson pulled a gun on defendant and defendant shot him, defendant observed Young pull his hand out of his pocket and defendant shot him, and defendant observed Eloise Haynes with her hand in her pocket and he shot her.

■■ Self-defense is an affirmative defense, and once it is raised by defendant, the State must overcome it by proof beyond a reasonable doubt. (*People v. Halley*, 13 Ill.App.3d 719, 300 N.E.2d 645.) The issue of self-defense is one of fact. (*People v. Jordan*, 18 Ill.2d 489, 165 N.E.2d 296.) It is the function of the trial court, sitting as the trier of fact, to resolve conflicts in the evidence and to determine the credibility of witnesses. (*People v. Pelegri*, 39 Ill.2d 568, 237 N.E.2d 453.) A reviewing court will not disturb the court's findings unless the evidence is so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt. *People v. Jordan, supra; People v. Adams*, 113 Ill.App.2d 205, 252 N.E.2d 35.

Defendant's allegation of self-defense in the shootings of Young and Hudson was partially corroborated by the State's witnesses. However, the corroboration of a portion of defendant's testimony does not require this court to believe all of defendant's testimony. Defendant's testimony that, prior to the shootings, he observed Eloise Haynes with a gun in her possession was rebutted by the fact that the police recovered no weapon from her person. On the basis of this conflict in the evidence, the trial court found defendant's theory of self-defense to be unworthy of belief.

Upon a careful review of the record, we cannot say that this finding was palpably erroneous. If defendant's testimony is disbelieved, no legal justification for the shooting can reasonably be inferred. The victim opened the door when she heard two shots fired. Defendant, who was

standing merely 2 feet from her, shot her with a 4-foot-long 12-gauge shotgun.

We likewise reject defendant's contention that, even if Eloise Haynes did not have a weapon in her possession at that time, under the circumstances defendant acted under a reasonable apprehension of great bodily harm. Defendant correctly states as an abstract proposition of law that a person may act in self-defense even though the danger of bodily harm to him is apparent rather than real; however, a person must determine from the circumstances and the actual state of affairs surrounding him the necessity of resorting to deadly force. (*People v. Organ*, 345 Ill. 339, 178 N.E. 73; *People v. Lockett*, 85 Ill.App.2d 410, 229 N.E.2d 386.) Here, defendant, holding a shotgun after shooting two men, and without a word being uttered, shot Eloise Haynes as she stepped out of the bedroom. The trial court could properly have believed that the victim was not in a position to harm defendant. The record supports the trial court's rejection of defendant's theory of self-defense, and we will not substitute our judgment for that of the trier of fact.

Defendant's contention of defense of habitation is likewise untenable. Section 7—2 of the Criminal Code [2] provides that a person is justified in the use of force to prevent or terminate another's *unlawful entry into or attack upon a dwelling,* and further provides:

"[A person] is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

(a) The entry is made or attempted in a violent, riotous or tumultuous manner, and he reasonably believes that such force is necessary to prevent an assault upon, or offer of personal violence to him * * *, or

(b) He reasonably believes that such force is necessary to prevent the commission of a felony in the dwelling."

The evidence in the case at bar discloses a *lawful* entry by Eloise Haynes. It is undisputed that Myrtle McDaniels resided in the apartment with defendant. The State's witnesses testified that the victim accompanied Myrtle McDaniels to her apartment for the purpose of helping Myrtle remove her belongings. The trial court disbelieved defendant's uncorroborated testimony that persons in the apartment discussed their intention of taking his property, and rejected his testimony that he shot Eloise Haynes in self-defense.

Accordingly, we reject defendant's assertions of legal justification. However, we are convinced that the evidence does not support a convic-

---

[2] Ill. Rev. Stat. 1971, ch. 38, par. 7—2.

tion for the murder of Eloise Haynes; we are of the opinion that the evidence establishes that defendant is guilty of voluntary manslaughter. ■■ A person is guilty of voluntary manslaughter if, in taking another's life, he believes that he is in danger of losing his own life or suffering great bodily harm, but his belief is unreasonable.[3] (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(b); *People v. Lockett*, 85 Ill.App.2d 410, 229 N.E.2d 386.) Accordingly, pursuant to Supreme Court Rule 615(b)(3),[4] we remand the cause to the Circuit Court with directions to enter a finding of guilty of voluntary manslaughter as to the shooting of Eloise Haynes and to impose sentence thereon. The murder convictions as to the deaths of Larkey Hudson and David Young are hereby reversed in accordance with the State's confession of error.

Judgment as to the murder conviction for the death of Eloise Haynes modified and remanded with directions.

Judgments as to the murder convictions for the deaths of Larkey Hudson and David Young reversed.

HAYES, P. J., and LEIGHTON, J., concur.

---

[3] In addition to defendant's reliance on Section 9—2(b), defendant maintains that the evidence supports a finding of voluntary manslaughter pursuant to Section 9—2(a) which provides that a person commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another who the person attempts to kill but negligently or accidentally causes the death of the person killed. From the record before us, the inference most favorable to defendant is that defendant was provoked by Hudson and Young, not by Eloise Haynes. Therefore, defendant's reliance upon Section 9—2(a) is misplaced. See *People v. Wax*, 75 Ill.App.2d 163, 220 N.E.2d 600.

[4] Ill. Rev. Stat. 1971, ch. 110A, par. 615(b)(3).