THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALFONSO "SONNY" HALL, Defendant-Appellant.

(No. 73-395;

Fifth District—February 11, 1975.

Jeffrey H. Haas, of Chicago (Sandra Fogel, Holly Hill, and Ralph Hurvitz, of counsel), for appellant.

Howard L. Hood, State's Attorney, of Murphysboro, for the People.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

After a jury trial in the Circuit Court of Jackson County the defendant was convicted of the crime of murder (Ill. Rev. Stat. 1971, ch. 38, par. 9—1) and sentenced to a term of imprisonment of not less than 14 nor more than 15 years.

■■ The conviction appealed followed the second trial on the charge of murder, the first trial having ended in a hung jury. Defendant's initial contention is that the second trial on the charge of murder was barred by article I, section 10, of the Constitution of the State of Illinois and by the fifth and fourteenth amendments to the Constitution of the United States, which provide that a person cannot be put twice in jeopardy for the same offense. The double-jeopardy issue was raised by defendant's motion filed prior to commencement of the second trial and preserved in his post-trial motion. Attached to his motion were the affidavits of two jurors which stated "that after twelve hours of deliberation,

I along with the other jurors were deadlocked with eleven votes of guilty of manslaughter and one vote not guilty." The motion recites that the three verdict forms given the jury in the first case were "guilty of murder," "guilty of manslaughter" and "not guilty." The defendant now argues that 11 jurors voted to find him guilty of voluntary manslaughter and one juror voted to find him not guilty, *ergo*, the jury at the first trial were in agreement that the defendant did not have the requisite state of mind to be guilty of murder, and thus defendant's rights against double jeopardy were violated when he was placed on trial the second time for the murder. Defendant's argument is novel, if not ingenious. Had defendant been convicted of voluntary manslaughter at the first trial, the verdict would have constituted an acquittal of the charge of murder. (Ill. Rev. Stat., ch. 38, par. 3—4(a); *People v. Newman,* 360 Ill. 226, 195 N.E. 645; *People v. Dugan,* 15 Ill.App.3d 1071, 305 N.E.2d 308.) The defendant asserts that a "hung jury," with no jurors voting to find the defendant guilty of murder, should also constitute an acquittal of the murder charge, but since the jury was not given a verdict form for "not guilty of murder," the jury was unable to express its alleged conclusion. But it is also well settled that a mistrial, declared because a jury could not reach a verdict, does not constitute an acquittal and does not bar a subsequent prosecution. (*People v. Hudson,* 46 Ill.2d 177, 263 N.E.2d 473; *People v. Nilsson,* 44 Ill.2d 244, 255 N.E.2d 432.) We are unable to find any sanction for the novel argument and procedure defendant advances, and it cannot be approved in this case. We cannot inquire into the minds of the jurors who sat in the first case to determine their mental attitude or reasoning process, and the affidavits of two of the jurors are clearly insufficient to furnish any foundation for establishing what transpired. Neither the defendant nor the court can use the affidavits as a passage into the jury room, the deliberations of the jurors or their several mental attitudes. Even superficial consideration of the suggested procedure shows it to be an invitation to the purest form of speculation. At its best it would constitute an intrusion into the province of the jury. The only manner in which the conclusion of a jury on a verdict may be recognized is by a formal return of its verdict to the court.

Argumentively speaking, it is very possible that several of the jurors did believe that the defendant was guilty of murder but they agreed to find the defendant guilty of the lesser offense of voluntary manslaughter in a spirit of compromise to reach a verdict. Although not cited by either party, *People v. Griffin* (1967), 66 Cal.2d 459, 426 P.2d 507, 58 Cal. Rptr. 107, is in point. In *Griffin* the defendant was charged with first-degree murder. He was convicted of that offense, but the conviction was reversed by the United States Supreme Court. A second trial was held, but

the jury was discharged after failing to reach a unanimous verdict, and a mistrial was declared. After the jury was discharged, the foreman disclosed in open court that 10 jurors had voted for the acquittal and two jurors had voted to find the defendant guilty of second-degree murder. The defendant was subsequently convicted of first-degree murder at a third trial. The California Supreme Court affirmed the conviction and stated:

> "We may not infer from the foreman's statement that the jury had unanimously agreed to acquit of first degree murder. There is no reliable basis in fact for such an implication, for the jurors had not completed their deliberations and those voting for second degree murder may have been temporarily compromising in an effort to reach unanimity." (66 Cal.2d 459, 464, 426 P.2d 507, 510.)

In another case where the same argument was made the Supreme Court of Arkansas reached a similar result in *Walters v. State* (1974), 255 Ark. 904, 503 S.W.2d 895. Also see *Magee v. Superior Court of Santa Clara County* (1973), 34 Cal.App.3d 201, 109 Cal. Rptr. 758.

■■ We find the trial court properly denied defendant's motion for dismissal of the murder charge for alleged double jeopardy.

Aside from the double-jeopardy question, the defendant urges on this appeal that (1) he was not proven guilty beyond a reasonable doubt, and (2) the court erred in failing to instruct the jury as to the offense of voluntary manslaughter.

A review of the evidence is necessary. The State presented three occurrence witnesses. The first was Wayman Abbage. His testimony was that he was a cook at Intrigue's Kitchen, Carbondale, and was working there during the incident in question. The defendant and several companions came in and sat at a table and were drinking. Robert Shoffner (the victim) came in a short time later and sat at the same table. The witness was seated at the table when the defendant jumped up and said to Shoffner, "You don't never call my sister no M.F.," pulled his gun and started shooting. The first shot by defendant hit Shoffner in the back, and Shoffner was sitting down when the shooting started. The only gun the witness saw was the one possessed by defendant, and he did not hear Shoffner threaten or say anything to defendant. On cross-examination the witness altered his testimony somewhat. He said that he left the table and went into the kitchen before the shooting, and when he came back to the table the defendant was kneeling between his (defendant's) sister and Shoffner and defendant talked to Shoffner for 5 or 6 minutes. The defendant then jumped up, got behind Shoffner, yelled, "You don't call my sister no M.F.," and began shooting. After Shoffner was shot, he fell while turning very slowly to his left. Shoffner

had his back to defendant and did not turn around before he was shot.

The next witness called by the State was Norvell Haynes. He testified that he was present at Intrigue's Kitchen during the incident in question, that there was some type of argument between Shoffner and defendant, that the defendant was standing near Shoffner's chair at the time and that he heard the defendant tell Shoffner, "You don't cuss my sister." Shoffner then got up to leave and walked toward the door. At that time the defendant shot Shoffner from behind. When he was shot Shoffner put his hands on his head and then fell to the floor, and after he fell the defendant kept firing into Shoffner.

The testimony of Haynes relative to the occurrence was at such wide variance from all other testimony on both sides of the case that it was rejected by the trial judge in passing on defendant's motion for a directed verdict and discounted by the State.

The next occurrence witness to testify for the State was Lucinda Vincent, whose testimony was very similar to that of Abbage. She stated that Shoffner sat next to Florence Sample, defendant's sister. Sample began talking to Shoffner in a loud voice and she told her brother, the defendant, that "Shoffner called me a M.F." The defendant then walked around the table and began talking to Shoffner. The witness heard defendant tell Shoffner, "Man it is just like this, you don't call my sister or no other woman a M.F. just like that." The witness then left the table to go to the jukebox and did not hear the entire conversation. While she was at the jukebox the defendant jumped up, screamed, "Don't call my sister no M.F.," backed away from the table and shot Shoffner. The witness did not see the first shot fired but turned around immediately after hearing it. Shoffner was still sitting at the table on the edge of his chair when the witness turned around, and after the first shot was fired Shoffner began to move as if he were going to get up from his chair. The witness than saw defendant fire four more shots at Shoffner. The witness further testified that she did not hear Florence Sample, defendant's sister, yell anything to the defendant just before the first shot nor did she hear Shoffner make any threats to the defendant. She had no reason to believe that Shoffner had a gun on his person.

The Jackson County Coroner testified that he was present when an autopsy was performed on the body of Shoffner. There were seven bullet wounds on Shoffner's body, one on the side of his head, two in his left arm, two in the abdomen and two in his back. The cause of death was described as shock due to hemorrhage due to multiple gunshot wounds. The coroner did not describe the wounds on the body of deceased as either entry or exit wounds. However, a chart was introduced into evidence which showed the locations of Shoffner's wounds. It reveals that

there are two wounds on his back and only one on the front of his body. This suggests that at least one of the wounds on his back was caused by the entry of a bullet.

The defendant testified and admitted that he shot the deceased but claims that his actions were in defense of himself and of his sister Florence Sample. He stated that he went to Intrigue's Kitchen in Carbondale with his sister and several friends on the evening of January 27, 1973. At that time he possessed a handgun. He had allegedly purchased the gun earlier in the evening to give to another sister, Frances, for her protection. The defendant testified that while he and his friends were seated at a table in Intrigue's Kitchen, Shoffner entered the building and sat down at the same table. Shoffner sat next to the defendant's sister and at the opposite end of the table from the defendant. The defendant testified that he knew Shoffner, that he was a "big bully that liked to put up more than he could take," that he always carried a gun and that the defendant had seen Shoffner with a gun on three or four occasions.

After Shoffner joined the defendant's group in Intrigue's Kitchen, the defendant took two shells from his gun to get Shoffner's opinion of them. Shoffner allegedly inspected the shells and said, "What I had wasn't shit, and the type of gun he named I think was Super Eight I think, he said that it would blow that little shit away." The defendant interpreted that statement to mean that the gun Shoffner had was superior to the defendant's gun. Shoffner gave the shells back to the defendant, and the defendant put the shells back in his gun. After his conversation with Shoffner had ceased, he heard a loud noise at the other end of the table and then heard his sister say, "Would you tell Shoffner to leave me alone." The defendant stated that he then heard Shoffner call his sister a name. The defendant claimed that he walked to the other side of the table, knelt between Shoffner and his sister and tried to quiet them down. The defendant stated that he asked Shoffner to stop calling his sister names and that Shoffner said, "Nigger, I do what I want to do," and that he would "blow me and the bitch away if I just didn't shut up my damn self." When asked what he thought the latter statement meant, the defendant said, "That means going to try to kill you * * *." When the defendant told Shoffner that "it just ain't going to be like that," Shoffner allegedly said, "Nigger, with this Super Eight I got I will shoot you and go through you and kill your sister both." The defendant testified that he then tried to leave but that Shoffner grabbed his arm and pulled him back down to the table. The defendant then hit Shoffner with the back of his free hand and started to walk toward the door. He testified that he heard his sister say, "Look out, Sonny, he's got a gun." He further testified that he turned around, took his gun out of his pocket, saw Shoffner starting to

get out of his chair, and he, the defendant, fired one or two shots. Shoffner then went back down in his chair but stood up again. The defendant stated that it looked to him as though Shoffner had a handle of a gun in his hand and was "trying to get it out." He then fired some more shots and left the building. The defendant further testified that, when Shoffner was getting up from his chair for the first time before any shots had been fired, he could not see Shoffner's right hand and that it looked as though the right hand was in the location where the defendant knew that Shoffner always caried his gun. The defendant stated that, when he saw Shoffner getting out of his chair, he thought that Shoffner had intended to kill him and his sister. He based this belief on the knowledge that Shoffner had just told him that "he would blow me and the bitch away."

On cross-examination the defendant admitted that he did not see Shoffner's gun before the shooting and that Shoffner was not yet out of his chair when the defendant shot.

Florence Sample, the defendant's sister, corroborated the defendant's testimony. She testified that, after Shoffner entered Intrigue's Kitchen on the date in question, he sat between her, the witness, and Mattie Nevels. Shoffner began "playing" with Mattie Nevels, that Nevels asked Shoffner to leave her alone and that Shoffner refused to stop. Sample stated that she then asked Shoffner to leave Mattie Nevels alone and that Shoffner started calling her, the witness, names. She further testified that when the defendant asked Shoffner to stop calling his sister names, Shoffner said, "I will blow you and the bitch away." Sample stated that the defendant then got up to leave, that Shoffner had hit the defendant on the arm and that the defendant pushed Shoffner's arm away, that the defendant started walking to the door, that she saw Shoffner getting up with his hand on his side and that she saw the handle of a gun. Shoffner allegedly put his hand on the handle of his gun when he was getting up, and Sample yelled to the defendant, "Watch out, Sonny, he has got a gun." Sample stated that she then heard a shot and closed her eyes and that when she opened her eyes Shoffner was on the floor, and she and the defendant then left.

Mattie Nevels testified for the defendant. She was at the table with the defendant and his companions on the date in question. She stated that Shoffner entered the building, sat down next to her at the table and began "meddling" with her. Nevels testified that Florence Sample told Shoffner to leave her, Nevels, alone. Shoffner then began calling Sample names. Nevels stated that the defendant then walked over to Shoffner and squatted down beside him, but Nevels did not hear what was said or pay any attention to what was happening. She stated that the next thing she remembered was hearing a shot. She said that she did

not see who fired the shot and that the next thing she saw was the defendant and his sister going out the door.

Donald Green also testified for the defendant. He knew nothing about the shooting in question. Green testified about an incident in the summer of 1971 in which Shoffner allegedly pulled a gun on the defendant. The testimony was offered merely as proof the defendant knew Shoffner carried a gun.

Two other witnesses were called by defendant who testified that Shoffner had a reputation as a bully, difficult to get along with, and he carried a gun.

The defendant was charged with murder in that he, "without lawful justification and with the intent to kill or do great bodily harm to Robert Shoffner, a male person, did shoot Robert Shoffner with a pistol, thereby causing the death of Robert Shoffner."

■ ■ ■ The defendant argues that he was not proven guilty beyond a reasonable doubt of either murder or voluntary manslaughter, because his actions constituted a justifiable use of force.

Section 7—1 of the Criminal Code (Ill. Rev. Stat., ch. 38, par. 7—1) provides:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another * * *."

The defendant cites *People v. Halley*, 13 Ill.App.3d 719, 300 N.E.2d 645, for the proposition that, once the affirmative defense of self-defense is interposed, the burden of proving guilt beyond a reasonable doubt as to that issue is on the State. (See also *People v. Brown*, 19 Ill.App.3d 757, 312 N.E.2d 789.) However, the issue of self-defense presents a question of fact. (*People v. Washington*, 27 Ill.2d 104, 187 N.E.2d 739; *People v. Brown*; *People v. Dillard*, 5 Ill.App.3d 896, 284 N.E.2d 490.) *In People v. Halley*, this court stated:

> "The issue of self-defense is a question of fact for a jury under proper instructions, and a jury's decision on that issue will not be disturbed unless the evidence is so unreasonable, improbable or unsatisfactory as to suggest a reasonable doubt." (13 Ill.App.3d 719, 722-23.)

In the instant case, the testimony of the State's eyewitnesses and of those called by the defense is in sharp contrast. In such a case, it is the jury's

province to determine the credibility of the witnesses and the weight to be given to the testimony. (*People v. Zuniga*, 53 Ill.2d 550, 293 N.E.2d 595.) In the case at bar, there was sufficient evidence from which the jury could have determined beyond a reasonable doubt that the defendant was not justified in shooting Shoffner.

The only evidence supporting the defendant's theory of self-defense is the testimony of the defendant and of his sister, Florence Sample. Both of these witnesses must be considered "interested parties," and doubtless the jury considered that fact in determining the weight to be given their testimony. The testimony of the defendant and his sister that is relevant to the defense of self-defense is contradicted by other evidence. According to the defendant and Sample, Sample yelled, "Look out Sonny, he's got a gun," as the defendant was walking away from the table. None of the four occurrence witnesses, however, testified that they heard Sample yell to the defendant. Abbage and Vincent testified that the defendant did not turn his back on Shoffner but that he moved behind Shoffner and then shot him. Also, the defendant's theory of self-defense is weakened by the fact that there was no testimony that a weapon was ever found on Shoffner's person or in the vicinity of where he fell.

People's Exhibit No. 1, the chart prepared by Dr. Rossiter which showed the locations of Shoffner's wounds, may also be deemed contradictory of the defendant's theory of self-defense. The chart suggests that at least one of Shoffner's wounds was caused by a bullet entering the back.

After a review of all the evidence bearing upon the defense of self-defense, we must conclude that it is not so unreasonable, improbable or unsatisfactory as to suggest a reasonable doubt, and we will not disturb the jury's verdict on that issue.

The defendant's final contention is that the court erred in failing to instruct the jury as to the offense of involuntary manslaughter as defined in section 9—2(a) of the Criminal Code (Ill. Rev. Stat., ch. 38, par. 9—2 (a)) (provocation).

The court did accept People's Instruction No. 8 (IPI— Criminal No. 7.05) which defined the offense of voluntary manslaughter as set out in section 9—2(b) of the Criminal Code (Ill. Rev. Stat., ch. 38, par. 9—2 (b)) (belief of justification). The defendant did not object to that instruction concerning voluntary manslaughter as defined in section 9—2(a). The appropriate instruction would have been IPI—Criminal No. 7.03. The defendant claims that the court should have given the instruction even though it was not tendered. The defendant cites *People v. Taylor*, 36 Ill.2d 483, 224 N.E.2d 266, for the proposition that " '* * * if there is any evidence in the record which, if believed by the jury,

would reduce a charge of murder to manslaughter, an instruction defining that crime should be given. [citations.]'".

■■ A reviewing court will not weigh the evidence upon a question of whether an instruction is proper on a certain theory, and very slight evidence upon a certain theory of the case will justify the giving of an instruction. (*People v. Kalpak*, 10 Ill.2d 411, 140 N.E.2d 726; *People v. Kucala*, 7 Ill.App.3d 1029, 288 N.E.2d 622; *People v. Hyde*, 97 Ill.App.2d 43, 239 N.E.2d 466.) There was some testimony in the case at bar suggesting that Shoffner may have provoked the defendant. Thus, IPI—Criminal No. 7.03 should have been given if it was tendered.

■■ The defendant has cited a few cases from other jurisdictions for the proposition that the court has a duty to give a manslaughter instruction sua sponte if a finding of that crime could be made. When the evidence in a murder case would support a verdict of manslaughter and the defendant does not request a manslaughter instruction, the giving of such an instruction is committed to the discretion of the trial judge. (*People v. Taylor*; *People v. Mitchell*, 12 Ill.App.3d 960, 299 N.E.2d 472; *People v. Meeks*, 11 Ill.App.3d 973, 297 N.E.2d 705.) It is well established in Illinois, however, that the trial court is under no duty to give instructions not requested by counsel. *People v. Springs*, 51 Ill.2d 418, 283 N.E.2d 225; *People v. Smith*, 20 Ill.App.3d 756, 314 N.E.2d 543; *People v. Barber*, 20 Ill.App.3d 977, 313 N.E.2d 491.

The defendant relies upon *People v. Joyner*, 50 Ill.2d 302, 278 N.E.2d 756, for the proposition that, under certain circumstances, the court must give a manslaughter instruction sua sponte. In *Joyner* the evidence was sufficient to justify the giving of a voluntary manslaughter instruction. The defendant did tender such an instruction, but it was refused because it was not in conformance with IPI—Criminal No. 7.05. No instruction on voluntary manslaughter was given. The supreme court reversed the murder conviction because the evidence established a very close case as to whether the defendant was guilty of murder, guilty of voluntary manslaughter or not guilty, and it was therefore crucial that the jury be fully and properly instructed. The defendant alleges that the instant case is similar to *Joyner* because, just as the defendant in *Joyner* had expressed a desire to have the jury instructed on voluntary manslaughter, the defendant in the case at bar expressed a desire to have IPI—Criminal No. 7.03 given by tendering that instruction in the first trial. The defendant argues that, since No. 7.03 was tendered and refused at the first trial, his failure to tender it at the second trial should not be deemed to have waived the issue on appeal. The defendant's contention is without merit, however, since the record does not establish that IPI—Criminal No. 7.03 (manslaughter-provocation) was refused at the first trial. The

defendant's contention is also without merit because this court does not know what evidence was introduced at the first trial. Perhaps there was no evidence warranting IPI—Criminal No. 7.03. Under such circumstances, a refusal by the trial court of No. 7.03 at the first trial would not justify defense counsel's belief that tendering the instruction at the second trial would be useless.

■■ The issue raised on the *Joyner* case is also without merit because the evidence, while it may justify the giving of a manslaughter-provocation instruction, does not present a close question on manslaughter-provocation. Generally, no words or gestures, however provoking or insulting, can amount to considerable provocation which will reduce the crime to manslaughter. (*People v. Washington; People v. Thompson,* 11 Ill.App.3d 752, 297 N.E.2d 592.) In the case at bar, there is little evidence other than the words allegedly spoken by Shoffner that is relevant to the issue of provocation.

In *People v. Mitchell,* 12 Ill.App.3d 960, 299 N.E.2d 472, the court held that *Joyner* did not overrule the holding in *People v. Taylor* and that a trial court need not give a voluntary manslaughter instruction sua sponte. *Joyner* was interpreted so as to apply only in a case which is a "close case factually." (See also *People v. Meeks,* 11 Ill.App.3d 973, 297 N.E.2d 705.) In *People v. Rooney,* 16 Ill.App.3d 901, 307 N.E.2d 216, this court affirmed a murder conviction. In rejecting an argument that the trial court should have instructed the jury on the offense of voluntary manslaughter sua sponte, this court stated:

> " 'It may be that more accurate results would be obtained if the trial judge was required to instruct as to both the greater and the lesser offenses whenever the evidence would sustain either verdict, and in some jurisdictions such a requirement has been imposed by statute or by decision. \* \* \* But we are not sufficiently persuaded that we are willing to eliminate by judicial decision an established procedure that has long been considered to operate for the benefit of those accused of crime. We therefore adhere to our present procedure and hold that the trial judge did not err in failing to give a manslaughter instruction on his own initiative.' " 16 Ill.App.3d 901, 905, 906.

For the foregoing reasons the judgment of the trial court is affirmed.

Affirmed.

G. MORAN and KARNS, JJ., concur.