THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES TIRRELL *et al.*, Defendants-Appellants.

Third District    No. 79-947

Opinion filed August 22, 1980.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, for appellants.

Edward Keefe, State's Attorney, of Rock Island (John X. Breslin and Kenneth A. Wilhelm, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

The Tirrell brothers, James, Sherman and Theodore, appeal from their convictions for murder following a jury trial in the Circuit Court of Rock Island County. Sherman and Theodore were sentenced to 25-year terms of imprisonment. James Tirrell received a sentence of 20 years' imprisonment.

On appeal the following issues are raised: whether the State failed to prove beyond a reasonable doubt that the defendants were not justified in using deadly force in self-defense; whether there was sufficient evidence upon which to base the defendants' convictions for murder beyond a reasonable doubt or whether their convictions should be reduced to voluntary manslaughter; specifically, whether there was sufficient evidence that the defendants did not act under a sudden and intense passion; and whether there was sufficient evidence that the defendants did not act under an unreasonable belief that circumstances justified the killing; and whether the trial court properly admitted into evidence testimony concerning the defendants' violent nature.

A review of the evidence adduced at trial is necessary for a resolution of the issues raised. The State presented three occurrence witnesses, each of whom described the killing of the victim, Albert Manley, as an aggressive and brutal physical attack by all three defendants.

Mark Thornton, the first State's witness, testified that he had known and worked with the defendants for approximately five months. On the date of the incident Mr. Thornton drove the three defendants, along with two women, Sonya Christopher and Gwen Wilson, to the Silver Streak Tavern in an effort to locate a friend of his, Steve Henton. Upon exiting the tavern Thornton noticed that the defendants had gathered around Albert Manley's car which was parked on the sidewalk in front of the Silver Streak Tavern and parallel to Thornton's car, which was parked in the street. Thornton could not hear any of the conversation. At that time William Lee, a friend of Thornton's, arrived in his car and began talking to Thornton, who stood beside the passenger side of Lee's car with his back towards the tavern and Manley's car.

When Lee directed Thornton's attention to Manley's car by saying, "Look at those fools over there playing," Thornton saw defendant Theodore Tirrell staring in Manley's car window and defendant Sherman Tirrell walking to the other side of the car. Manley was pushing his car door against Theodore's leg in an attempt to break away and run. When Manley jumped out and began to run, Theodore quickly caught him by the shirt. Manley tried to tear his shirt loose so that he could run. Sherman then grabbed Manley from behind. Thornton testified that he walked around his own car in order to get a closer look at what was happening and that he saw no blood on Theodore at the time Manley jumped from his car in an effort to escape. He first noticed some blood on Theodore's face at the time Theodore grabbed Manley.

According to Thornton, defendant James Tirrell jumped out of Thornton's car and joined his two brothers. When Manley had been grabbed and could not run, the three defendants, who were all bigger than Manley, took turns striking blows at him. Thornton testified that he could not see if Manley at that time was striking any blows since the three defendants surrounded Manley and blocked Thornton's sight. The defendants then took Manley out to the street and knocked him down against the front wheel of William Lee's car. Manley was not on his feet and was just lying against the tire while all three defendants were swinging at him. Up to this point the fighting lasted approximately one minute. Manley was then moved to a telephone pole, by way of the defendants picking him up and hitting him, where he was knocked to the ground and continually kicked for a period of about three minutes. During this period of kicking, Manley was merely lying on the ground and exhibiting no movement.

Defendants Sherman and James Tirrell then left and returned to Thornton's car. Defendant Theodore Tirrell remained, still kicking Manley. He then grabbed a couple of wooden sticks and swung them at Manley two or three times. Thornton testified that he saw defendant Theodore

Tirrell swing the sticks at Manley, although he did not see the blows land. The sticks did break when swung at Manley, which led Thornton to assume that they struck Manley. Theodore then threw a rock (approximately two inches in diameter and four inches long) at Manley. Thornton testified that he did not see if it hit Manley.

At the time defendants Sherman and James Tirrell left Manley, Thornton testified that he noticed that defendant Theodore Tirrell was bleeding only from the left center of his chin. He did not see Sherman bleeding; however, when Sherman was inside Thornton's car he observed a cut on his chest. As Thornton began to drive away from the scene with all three defendants inside the car he testified to hearing defendant Theodore Tirrell state that he should run over Manley with his car.

Thornton estimated that the entire incident lasted from 10 to 15 minutes. When asked what was the total amount of times Manley was struck, Thornton first stated it was "pretty hard to say when all three of them were swinging." He did estimate that Manley was struck between 15 and 20 times in the period of one minute. Thornton, however, could not be sure and stated alternately that Manley was struck "[p]robably every one to two seconds" in that one-minute period. In testifying to the number of blows struck, Thornton was referring solely to the one-minute period in which blows were struck with the defendants' fists. This did not include the subsequent three-minute period in which defendants kicked Manley.

Thornton's testimony at trial contained some inconsistencies with prior statements he made during the initial investigation. Thornton was placed into custody during the initial investigation and questioned about Manley's killing, since a witness, Emily Ellis, gave the police his license plate number which she saw while at the scene of the beating. When he was initially interrogated, Thornton denied he knew any of the defendants. At the preliminary hearing Thornton also stated that when Manley initially got out of his car he started yelling "Cap him, cap him," which Thornton understood as street language for "Shoot him." This testimony was not repeated at trial. Thornton later signed a written statement which was substantially similar to his testimony at trial.

At trial Thornton indicated that after witnessing the incident he wasn't in "too big a hurry to be telling who the defendants were." Although the defendants on appeal attempt to discredit Thornton's testimony based on the inconsistencies discussed above, we are of the opinion that the explanation offered by the witness during trial is sufficient to explain the discrepancies. Obviously, the witness was frightened by what he had observed and initially feared reprisals from either the defendants or law enforcement authorities.

The State's second eyewitness, William Lee, testified as to his own observations of the incident. When Manley exited his own car, two

defendants started to beat on him. Manley began to run away at one point, but was immediately caught. When all three defendants got to Manley, they "commenced to beat him and kick him and trying to pluck his eyes out [*sic*]" and also "tried to pull his mouth open and * * * apart." Manley's arms were stretched out at this point. He testified that he could see everything very well because he was inside his car and the fighting occurred in the front of his car's hood. The reason Lee jumped inside his car was because he was "scared to death." Lee saw that Manley was on his feet for approximately 1 to 1½ minutes before all three defendants "beat him down" and "stuffed him under the [Lee's] car" and were "beating and kicking him." The beating at Lee's car lasted a total of three to five minutes according to Lee. After Manley was moved by defendants from under Lee's car, Lee immediately left the scene.

Lee testified that he did not see Manley's hands at the time Manley first got out of his car. He did, however, definitely see Manley's hands during his beating in front of Lee's car and stated there was nothing in his hands at that time. Furthermore, Lee testified that he did not see any injuries on any of the defendants. This would seem to indicate that if the defendants were injured at that time, there could not have been any serious bleeding involved.

Emily Ellis, the third eyewitness for the State, testified that while driving home from work at approximately 6 p.m. she noticed one or two black men attempting to pull another man from his car in front of the Silver Streak Tavern. Ms. Ellis stopped her car five to six feet away and observed that the victim was hit "really hard" when he was down. At least two or three men who were all larger than the victim "were hitting with their fists, and when he [the victim] went on the ground, they started kicking him and stomping him like you would smash a banana."

Ms. Ellis watched the beating for five to six minutes before driving a little farther down the street and calling the police from a resident's house. About three minutes later she left the residence and noticed one man still kicking the victim. She estimated the total length of time of the beating to be 10 minutes.

Ms. Ellis was unable to state, either at the time of the incident or at trial, exactly how many people were actually beating on the victim. She consistently stated that there were at least two people doing the beating, maybe more. On cross-examination, Ms. Ellis was asked:

"Q. Is it your testimony today that 2 or 3 people were beating Mr. Manley or is it your testimony today that it might have been 5 or 6 or don't you know how many people were beating Mr. Manley?

A. I am not sure. More than two.

Q. Did you tell the police that all 5 or 6 of these people that you saw were beating Mr. Manley?

A. At that time that's what I thought. I still can't say how many people there were.

Q. Are you basing your testimony on what you thought happened?

A. No. I just don't know how many people were there."

Detective Terkelson testified that based on his interpretation of a phone conversation he had with Ms. Ellis on the evening following the incident, Ms. Ellis saw primarily two people beating on Manley and that six others may also have taken part to some degree.

Although Ms. Ellis was unable to state how many people actually hit the victim, this confusion is understandable given the fact that a crowd of at least seven people were at the scene. Thus the credibility of her testimony is not impugned by her inability to accurately state the exact number of attackers.

The State also presented the testimony of the police officers who worked on the case as well as that of a neurosurgeon who treated Manley in a hospital emergency room and the pathologist who performed an autopsy on Manley. Over defense objections, the latter witness testified that in his opinion Manley's death was caused by head injuries when he was struck with an object or objects.

The defense presented the testimony of each of the three defendants plus that of an additional eyewitness. The defendants' testimony presented an account of the incident which depicted Manley as the initial aggressor and as a violent and dangerous attacker once the altercation had begun.

Both Sherman and Theodore Tirrell testified that Theodore first approached Manley to ask if he wanted to buy a tape player, to which Manley reportedly replied, "Hell, no, and you mother fuckers from Detroit think you are so much." According to the defendants' testimony, Manley then slashed Theodore with a razor, jumped from the car shouting "Cap him, cap him," and then cut Sherman with the razor blade. The three brothers described Manley as acting like a madman, cursing and swinging the razor throughout the incident. Sherman and James Tirrell stated that they became involved because they believed their brother's life was in jeopardy. They also testified that they kicked Manley in an attempt to remove the razor blade from his hand and stopped kicking the victim when the blade had been dislodged. No razor was found at the scene other than one found lying on the front seat of Manley's car still housed in its casing. This blade was not introduced into evidence.

The defendants' account of the incident was substantiated by Sonya Christopher, a girlfriend of Theodore Tirrell, who was seated in the passenger seat in the front of Thornton's car throughout the incident.

Also testifying for the defense was Helen Kelso, who worked at the Moline Public Hospital and stated that she knew all of the Tirrell brothers.

She testified that Theodore and Sherman had been treated in the emergency room of the hospital during the evening of May 21, 1979, the date of the beating. Corroborating the reports of the injuries received by Sherman and Theodore was the testimony given by Esther Easter, a friend of the Tirrell brothers, who saw them in the early morning hours of May 22, 1979, and the testimony of Alphonse Anders, the defendants' uncle, to whose home the Tirrell brothers were taken by Thornton following the incident.

Dr. William Bertelsen, the emergency room physician who treated the Tirrell brothers, was called as a rebuttal witness for the State. During cross-examination he stated that Theodore Tirrell had received 27 stitches to close his wounds, all of which the doctor characterized as being superficial. According to Sherman Tirrell's testimony, he required 16 stitches in his throat and four to six in his hand to close his wounds.

■■ From this review of the evidence it is clear that two quite different interpretations of the events which transpired in front of the Silver Streak Tavern on the afternoon of May 21, 1979, were presented to the jury. Undisputedly, the defendants' testimony was sufficient to raise the issue of self-defense. (See *People v. Adams* (1979), 71 Ill. App. 3d 70, 388 N.E.2d 1326.) Once the issue is raised, the burden shifts to the State to prove beyond a reasonable doubt that the defendants did not act in self-defense. (Ill. Rev. Stat. 1979, ch. 38, par. 3—2(b); *People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681.) The defendants in the case at bar contend that the State has failed to meet that burden.

The issue of self-defense is a question of fact. (*People v. Hall* (1975), 25 Ill. App. 3d 992, 324 N.E.2d 50.) If the defendants' evidence on the issue of self-defense is palpably contrary to the jury's verdict and renders that verdict so improbable as to leave a reasonable doubt as to the defendants' guilt, then the trial court's judgment must be reversed. (*People v. Clemens* (1972), 9 Ill. App. 3d 312, 292 N.E.2d 232.) However, the defendants' exculpatory testimony need not be believed by either the jury, the trial court, or a court of review. See, *e.g., People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.

■■ After a review of all the evidence bearing upon the defense of self-defense, we must conclude that the jury's verdict in the present case is not so unreasonable, improbable or unsatisfactory as to suggest a reasonable doubt, and we will not disturb the jury's verdict on that issue. The defendants' evidence that Manley initiated the altercation was not supported by any of the State's witnesses. Furthermore, even if Manley had initiated the altercation, the defendants' subsequent actions are not defensible or explainable on the grounds that they wished to disarm Manley, as they claimed. The beating and kicking continued after Manley was on the ground and could not have seriously harmed the three Tirrell brothers. The right of self-defense does not permit the pursuit and killing in retaliation or

revenge of an initial aggressor after he retreats. Ill. Rev. Stat. 1979, ch. 38, par. 7—4(c)(2); *People v. Thornton* (1962), 26 Ill. 2d 218, 186 N.E.2d 239; *People v. Hines* (1975), 31 Ill. App. 3d 295, 334 N.E.2d 233.

■■ While it is true that in judging whether the defendants' use of force in self-defense was justified, it is the defendants' perceptions of danger, not the actual peril, that are dispositive, and defendants are not required to exercise "infallible judgment" in a brief period of time while under great stress and excitement. (See *People v. Shipp* (1977), 52 Ill. App. 3d 470, 367 N.E.2d 966; *People v. Harling* (1975), 29 Ill. App. 3d 1053, 331 N.E.2d 653.) We believe, given this subjective test, the defendants' actions in the case at bar were not justifiable under the guise of self-defense.

The defendants next contend that their convictions for murder should be reversed and reduced to convictions for voluntary manslaughter on the alternate grounds that the evidence showed beyond a reasonable doubt that they acted under a sudden and intense passion or that they acted under a belief that the circumstances justified the killing, even though that belief was unreasonable. We disagree.

The offense of voluntary manslaughter is codified in Illinois as follows:

"(a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed * * *
* * *.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." (Ill. Rev. Stat. 1979, ch. 38, par. 9—2.)

The principles stated in article 7 are as follows:

"Use of Force in Defense of Person. A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." (Ill. Rev. Stat. 1979, ch. 38, par. 7—1.)

Under either definition of voluntary manslaughter, the evidence in the case

at bar fails to provide proof beyond a reasonable doubt that the defendants are guilty of that crime rather than the more serious offense of murder of which the defendants were convicted by jury verdict.

■■ Preliminarily, we note that a defense of self-defense negatives an inference of sudden and intense passion. (*People v. Yates* (1978), 65 Ill. App. 3d 319, 382 N.E.2d 505.) Our supreme court, in a case similar to the instant case and when requested to reduce the grade of an offense from murder to manslaughter, stated as follows:

> "The present suggestion amounts to a request that because the jury rejected the claim of self-defense, this court should try the defendant again on a different legal theory. This we decline to do." *People v. McKinney* (1968), 40 Ill. 2d 372, 375, 240 N.E.2d 577, 579.

The jury's verdict of guilty of murder indicates its conclusion that all elements of the offense had been proved beyond a reasonable doubt and that no circumstances existed which would have justified, or even allowed the defendants to unreasonably believe that there was justification for the killing. (*People v. Peery* (1976), 41 Ill. App. 3d 533, 354 N.E.2d 536.) Having reviewed all the evidence in the case at bar, we are convinced that it supports the verdicts of guilty of murder beyond a reasonable doubt.

The account of the incident presented by the State's witnesses was in sharp contrast to that presented by the defense. According to the State's eyewitnesses, the victim was subjected to a deliberate, vicious and unwarranted attack by all three defendants. Manley was on the defensive during the entire incident. The two State eyewitnesses who testified concerning the razor stated that Manley had no razor in his hand. The defendants' testimony disputed this version of the incident, depicting Manley as an uncontrollable madman, wildly swinging a razor. Given a choice of which testimony to believe, the jury elected to believe the entirely credible account presented by the State's witnesses.

Furthermore, the defendants' own words belie their reliance on the existence of sudden and intense passion as a justification for their actions. Defendant Sherman Tirrell testified that when he was allegedly struck by the razor, he was "more afraid than angry." Both Theodore and James Tirrell testified to the effect that their main purpose in hitting and kicking Manley was to remove the razor from Manley's hand and that, having accomplished this purpose, they ceased the beating. Such purposeful actions, allegedly terminated when the stated objective was realized, are inconsistent with the defendants' assertions on appeal that intense passion controlled their violent actions.

*People v. Walker* (1965), 55 Ill. App. 2d 292, 204 N.E.2d 594, upon which the defendants rely, is distinguishable. In *Walker* the defendant's murder conviction was reversed by the reviewing court which found that the evidence supported a conviction of voluntary manslaughter. According

to every eyewitness in the *Walker* case, the decedent was wildly swinging a knife at everyone. Furthermore, the manner in which the decedent was stabbed by his own knife was not deliberate. The defendant in *Walker* testified that his shoving of the decedent as decedent swung his knife at the defendant caused the stabbing. In the case at bar the State's eyewitnesses testified that the victim had no weapon and that he was attacked as he attempted to escape. This credible testimony clearly distinguishes the present case from the factual situation existing in the *Walker* case.

Lastly, the defendants allege that the trial court erred in admitting into evidence testimony concerning their violent natures when they had not put their reputations in issue.

Officer George Pickett was originally called by the State as a witness in its case in chief. The defense later called Officer Pickett as its own witness. Pickett testified for the defense that Mark Thornton, when being initially questioned about the incident, denied knowing any of the defendants. When cross-examined by the assistant State's attorney about why Thornton did not tell Officer Pickett at that time the names of the defendants, Pickett responded that Thornton "was afraid of the subjects [defendants] because of their violent nature."

The defendants contend that this statement by Pickett unduly prejudiced the defendants and was erroneously admitted by the trial court in violation of the general rule against the admission of any evidence in behalf of the prosecution in criminal cases which tends to impeach the character of the accused or to show his general bad character or his tendency to commit the particular offense with which he is charged, unless the accused has opened the door for such evidence by introducing proof of his good character. *People v. Lewis* (1962), 25 Ill. 2d 442, 185 N.E.2d 254; *People v. Trimble* (1931), 345 Ill. 82, 177 N.E. 696.

Assuming *arguendo* that the admission of the complained-of testi- mony constituted error, it can only be concluded that in light of all the facts established at the defendants' trial it was harmless error. If there is a reasonable possibility that the evidence complained of might have contributed to a defendant's conviction, the error in admitting that evidence cannot be considered harmless (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Green* (1979), 74 Ill. 2d 444, 386 N.E.2d 272). However, if the evidence of guilt is overwhelming, the error will be held to be harmless beyond a reasonable doubt. *People v. Hairston* (1980), 86 Ill. App. 3d 295, 408 N.E.2d 382.

■■ In the case at bar, the evidence against the defendants was overwhelming, contrary to the defendants' assertions that the case was weak. The State's eyewitnesses presented evidence which the jury could reasonably believe that the defendants brutally, and without provocation or justification, killed Manley with their hands and feet. The defendants never denied

that Manley's death resulted from the beating they inflicted on him. The jury was thus made aware of the defendants' violent nature in relation to the charged offense, and the reference made to their nature during Officer Pickett's testimony was rendered harmless.

Accordingly, the judgment of the Circuit Court of Rock Island County is affirmed.

Affirmed.

ALLOY, P. J., and STOUDER, J., concur.