THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ORA McCOY, Defendant-Appellant.

Third District   No. 3—84—0826

Opinion filed February 11, 1986.

Robert Agostinelli and Stephen Omolecki, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Raymond L. Beck, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE BARRY delivered the opinion of the court:

Defendant Ora McCoy appeals from her conviction of voluntary manslaughter arising out of the shooting death of her husband, Willie McCoy. She was sentenced to four years' probation with home confinement.

At the jury trial in the circuit court of Will County, it was established that on the morning of May 9, 1983, the McCoy automobile had been speeding erratically along Interstate 80 in Will County when it came to a stop in the left lane. Some people who lived near the highway heard the honking of a car horn and a woman screaming, "Call an ambulance." They called for an ambulance and then went to investigate. They found Willie McCoy unconscious in the driver's seat with a wound in the chest, and Ora McCoy, his wife, in the passenger seat. According to the first person to reach the car, Ora told him that her husband had been shot from an overpass, but when he looked, he saw no signs of a bullet hole in the car, and no one was visible on the overpass.

Willie was removed from the car and efforts to resuscitate him were unsuccessful. Ora told another person at the scene that her husband had been shot, and she repeatedly asked about his condition. Because Ora was a very heavy woman and had only one leg, she was not removed from the car to her wheel chair until the police arrived. Ora told one police officer that Willie was driving very fast and was playing loud music on the radio when all of a sudden he told her he had been shot. She also told the officer that she stopped the car by plac-

ing one hand on the brake pedal and steering with the other hand. Ora told another officer that she could not remember what happened, that it all happened very fast and was just a blur, and that she had to grab the steering wheel and stop the car by depressing the brake pedal with her hand.

One of the men who came to the scene moved the car off the highway onto the shoulder. He stated that the transmission was in park when he got into the driver's seat. He also said that as he entered the car, he kicked a plastic tray that was on the floor "hump" and that there was nothing in the tray. A short time later, however, a police officer talking to Ora noticed a yellow washcloth in the tray and found a .25-caliber pistol folded in the cloth. Ora said that the gun was one Willie had bought for her to protect herself when she was alone. She also said that he always took a gun with him when they went to Chicago.

The pathologist who examined Willie's body testified that the gunshot wound was very large—probably a contact wound—and that the direction of the bullet indicated that he was shot while turned to the right with his left arm extended toward the right.

One State witness was a woman who testified that she was driving easterly on I-80 when the McCoy car passed hers going very fast. She saw the two persons in the car pushing at each other, and she saw the passenger punch the driver. The car sped .out of sight but later she came upon the car stopped in the passing lane.

Defendant Ora McCoy testified in her own behalf. Her right leg had been amputated above the knee in 1980 following an automobile accident in which the car skidded on ice into a utility pole. Willie was driving, and he suffered a head injury while Ora incurred severe lacerations to both legs and internal injuries. In addition to having one leg amputated, Ora does not have good bladder or bowel control and cannot bathe or use the bathroom without assistance. According to Ora, Willie suffered a personality change after the 1980 accident, becoming abusive and angry and sometimes getting drunk. She recounted specific incidents when he pulled her out of her wheelchair and left her on the floor, unable to get up. She described how, on April 12, 1981, he drove their van around a corner so fast that she fell out of the wheel chair. On that occasion, he left her on the floor of the van and chased their oldest son Ralph with a gun. Willie was arrested on that occasion, a fact which was corroborated by testimony of the police officers who were called to the scene at the time.

After losing her leg, Ora received therapeutic treatment from Northwestern Rehabilitation Institute in Chicago—first as an inpatient

and later on an out-patient basis. On May 9, 1983, Ora had an appointment in Chicago for an evaluation of her current condition. That morning Willie said he was not feeling very well. Before leaving he checked the gun by test-firing it in the back yard, and he changed a tire on the car, but he declined to fill the tank with gas, saying, "We will have enough gas to do what I want to do." She described how Willie drove very fast on I-80 and how he hit and poked her as he drove. Once he said, "I might as well kill us both." He started to reach for the gun on the tray, but she got it first. She remembered struggling with him and recalled that he said, "I got to get to a hospital," but she did not remember pulling the trigger of the gun.

On cross-examination, Ora explained that Willie took care of her for the first year after the accident, but since he could not stand it any more, he left her in December of 1981. He moved back into the family home in January of 1983. Under questioning, Ora indicated that she was not afraid of Willie because she loved him, that she stuck by him even on occasions when he had been drinking, that he never drank before the 1980 accident because he was a church-goer, that he always brought his pay check home so she could pay the bills before the 1980 accident but afterwards the bills weren't paid, and that he was laid off from his electrician's job sometime after the accident.

The defense also called Ralph McCoy, Ora's oldest son, who described the family row which occurred on April 12, 1981, when Willie chased Ralph with a gun and for which Willie had been arrested. Also testifying for Ora was Dr. Arthur Scheuneman, a psychologist who had been a part of the rehabilitation team that worked with her after she lost her leg. He stated that Ora's medical records contain information indicating that Willie probably had suffered a closed head injury at the time of the 1980 accident and that Dr. Scheuneman had been concerned that Willie might harm Ora or the family unless he received medical treatment. Willie had refused to come in for an interview. Although Dr. Scheuneman testified at length about the symptoms and effects of the possible head injury, the autopsy revealed absolutely no abnormalities in or about Willie's head, skull, or brain, according to the pathologist who performed the autopsy. Dr. Scheuneman also testified that Ora's failure to make a complete disclosure of what happened at the shooting scene would be consistent with her behavior during rehabilitation therapy, when she often blocked or repressed her problems and tensions instead of dealing with them forthrightly.

In rebuttal, the State called Willie's mother and his sister, who

both testified that Willie drank a lot of beer both before and after the 1980 accident and that his behavior toward them did not change after that date.

The jury was instructed as to both murder and voluntary manslaughter charges and returned a verdict of guilty of voluntary manslaughter. At the sentencing hearing, there was evidence that defendant is able to care for her two minor sons, aged seven and 10. The court imposed a sentence of four years probation with defendant to be confined to her home except to attend religious services, to obtain medical treatment, or to receive rehabilitation therapy.

■ The first issue raised on appeal is whether the evidence was sufficient to support the verdict of guilty on the manslaughter charge. Section 9—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—2) defines voluntary manslaughter, in part, as follows:

> "(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable."

The defense theory at trial was that defendant believed that her life was in such danger that deadly force was justified and that this belief was a reasonable one under the circumstances. When the jury convicted her of manslaughter, presumably the jury found that her belief that the killing was justified was unreasonable. On appeal, she insists that the uncontradicted evidence in her favor compelled a finding that her belief was reasonable.

Defendant's testimony on direct examination did present a coherent narrative of a frightened woman who had been abused by her husband in the past and who had reason to believe that he might be intending to do serious harm to her at the time she shot him. Some of her testimony was corroborated by the psychologist who had treated her and also by her son, but a reading of the entire record reveals that the defense case was not as overwhelming as defendant claims. At the scene of the crime, defendant first attempted to blame an unknown assailant on an overpass, and she subsequently tried to conceal the weapon. During cross-examination, defendant became evasive and argumentative more than once and denied statements which she had just made. She repeatedly asserted how much she loved and trusted her husband, and she insisted that anyone would have behaved as she did.

■ We cannot say that the jury erred in finding defendant guilty of voluntary manslaughter. The car had been traveling 80 miles per

hour on a busy highway at the time defendant shot the driver point-blank in the chest. The jury could properly conclude that it was unreasonable for defendant to believe that shooting Willie would prevent her from suffering serious harm. The jury was, of course, free to reject any or all of defendant's testimony even though it was not directly contradicted by other eyewitnesses where there is contradictory circumstantial evidence. (*People v. Wilkes* (1971), 2 Ill. App. 3d 626, 276 N.E.2d 761.) The question is whether defendant's evidence of the reasonableness of her belief is palpably contrary to the jury's verdict and renders that verdict so improbable as to leave a reasonable doubt as to defendant's guilt. (*People v. Tirrell* (1980), 87 Ill. App. 3d 511, 408 N.E.2d 1202.) Applying that test to the case at bar, we hold that the verdict was not so improbable as to leave a reasonable doubt as to defendant's guilt.

Defendant relies upon *People v. Estes* (1984), 127 Ill. App. 3d 642, 469 N.E.2d 275, and *People v. Liddell* (1975), 32 Ill. App. 3d 828, 336 N.E.2d 815, both cases where this court reversed convictions for voluntary manslaughter on the ground that the State did not disprove beyond a reasonable doubt defendant's claim to have acted in self-defense. In *Estes*, the defendant's account of a brutal fight with her drunken husband was supported by witnesses who saw her bruised neck and torn clothes immediately after the fatal shooting and also by the high alcohol level in the decedent's blood, as well as other evidence. In *Liddell*, the majority concluded that the trier of fact had improperly rejected the defendant's version of the fatal altercation since that version was not improbable or contradicted in material part.

Both of these cases involved an affirmative defense of self-defense which the State was required to disprove beyond a reasonable doubt while the case before us is an "unreasonable belief" voluntary manslaughter case. While there is some similarity to the defenses in both types of cases, there is also a difference as to what the State must prove and disprove. (See *People v. Bolden* (1985), 132 Ill. App. 3d 1047.) It is also significant that defendant here, unlike *Estes* and *Liddell*, gave conflicting accounts of the shooting. Furthermore, the jury here could have concluded that the act of shooting the driver of a car that had been going 80 miles per hour was not consistent with a reasonable belief that defendant had more to fear with Willie alive than with him mortally wounded.

■ Defendant also contends that her conviction must be reversed because the jury was erroneously instructed. In giving the issues instruction as to voluntary manslaughter, the court omitted one clause that is a part of Illinois Pattern Jury Instruction (IPI), Criminal, No.

7.06 (2d ed. 1981)—*i.e.* that the State had to prove that defendant believed that circumstances existed which would have justified killing Willie. The instruction with the omission was tendered by the State. Defense counsel did not object and did not tender a correct version. The post-trial motion did not mention any such omission. Consequently, any error was waived. *People v. Almo* (1985), 108 Ill. 2d 54; *People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248.

█ Furthermore, we cannot say that plain error occurred. We have reviewed the instructions in their entirety, and we have determined that the court fully informed the jury of all the elements of voluntary manslaughter in other instructions, particularly IPI Criminal 2d No. 7.05 (People's instruction No. 13) given immediately before the defective instruction. It is a firmly established rule that no one instruction need state all the applicable law and that the instructions are sufficient if, taken as a group, they adequately inform the jury. (*People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697; *People v. Harris* (1975), 33 Ill. App. 3d 600, 338 N.E.2d 129.) The omission in the issues instruction in this case would not confuse the jury.

For the reasons stated, we affirm the conviction of voluntary manslaughter and the sentence imposed by the circuit court of Will County.

Affirmed.

HEIPLE, P.J., and SCOTT, J., concur.