STATE, RESPONDENT, *v.* TRUEMAN, APPELLANT.

(No. 2,252.)

(Submitted April 5, 1906.   Decided May 14, 1906.)

*Criminal   Law—Homicide—Threats—Evidence—Cross-examination—Intoxication—Attorneys—Misconduct —Former   Jeopardy.*

Criminal Law—Homicide—Threats—Hearsay Testimony.
   1.   Testimony of a witness for the state, in a prosecution for murder, that he knew defendant had made threats against deceased, because his neighbors had told him so, was hearsay and inadmissible.
Same.
   2.   A threat, testified to by a witness for the state in a prosecution for homicide, as having been made by deceased in the following words: "I will get you sons-of-bitches yet," was inadmissible where the record failed to disclose that deceased was intended to be included in the class so characterized.
Same—Intoxication—Cross-examination.
   3.   Where a witness for the state, in a prosecution for murder, testified that he and deceased had been together on the day of the homicide and told generally of their movements, a question whether they had anything to drink that day was proper cross-examination for the purpose of showing such a condition of sobriety on the witness' part as to make it likely that he remembered what occurred and as shedding light upon the action of deceased, the contention of defendant having been that he acted in self-defense.
Same—Cross-examination—Self-defense.
   4.   It was error for the trial court, in a prosecution for murder, to exclude a question asked a witness for the state on cross-examination, whether he had not seen deceased carrying an ax-handle around with him on the day of the homicide, where the witness on direct examination had stated that deceased had walked up behind witness and defendant

and struck the latter over the shoulder with the handle—the evidence sought to be elicited not only having been proper cross-examination, but tending directly to sustain defendant's contention that deceased sought the encounter and had prepared himself for it.

#### Same—Self-defense—Cross-examination—Curing Error.

5. The mere fact that, in a prosecution for murder, evidence, on cross-examination, tending to show that deceased had sought the encounter and that defendant acted in self-defense, was cumulative in character, did not cure error in excluding it, since, if permitted to answer, the jury might have believed the witness under examination and not those preceding him.

#### Same—Intoxication—Cross-examination.

6. Where, in a prosecution for homicide, a witness had testified that he saw deceased on the day of the homicide and that he appeared to have been drinking, he should, on cross-examination, have been permitted to answer a question whether he noticed that the drinking affected the decedent's conduct, opinions of nonprofessional men as to intoxication, fear, anger, etc., being admissible in every judicial inquiry.

#### District Courts—Trial—Decorum.

7. The district court should see that the trial of a cause is conducted in an orderly and decorous manner, and neither counsel nor witnesses should be permitted to violate the proprieties of the court-room with impunity.

#### Criminal Law—Homicide—Attorneys—Misconduct—Abuse of Witnesses.

8. In a prosecution for homicide an attorney employed by the widow of deceased to assist the state's attorney, who in course of the examination of a hostile witness, whom the court had compelled the state to call, and whose conduct toward counsel was exasperating and impertinent—remarked that the prosecution did not vouch for the witness, that he could not tell the truth, asked the witness whether he was *non compos mentis* or knew anything at all, and stated that witness unqualifiedly lied and was a ''self-deluded fool that knew nothing,'' was guilty of such misconduct as will work a reversal of the judgment of conviction if properly presented for review.

#### Same—Objectionable Evidence—Misconduct of Attorneys.

9. Counsel for the state, in a prosecution for homicide, sought to get before the jury the fact that the deceased had left surviving him a widow and a small child. He proved this fact, over objection, but upon motion of defendant's counsel this testimony was later stricken out. Immediately upon this ruling, counsel for the prosecution called the widow and, by questions asked for that purpose, again brought the matter ordered stricken to the attention of the jury, and thereupon consented to the striking of this testimony. *Held,* that the behavior of counsel in asking questions which he knew, or had reason to believe, in view of the previous ruling, the court would not permit to be answered, constituted misconduct which, if properly presented, will work a reversal of the judgment of conviction.

#### Same—Former Jeopardy.

10. *Held,* under *State* v. *Keerl,* 33 Mont. 501, 85 Pac. 862, that, where the jury on a former trial of defendant charged with homicide had failed to agree, was discharged and the cause continued to the next succeeding term of court, the district court on the second trial properly refused to require the jury to return a verdict upon defendant's plea of former jeopardy.

*Appeal from District Court, Flathead County; J. E. Erickson, Judge.*

EDWARD B. TRUEMAN was convicted of the crime of manslaughter, and appeals from the judgment of conviction and from an order denying his motion for a new trial. Reversed and remanded.

*Mr. Albert J. Galen,* Attorney General, and *Mr. E. M. Hall,* Assistant Attorney General, for Respondent.

*Messrs. Noffsinger & Folsom, McIntire & Kendall, Mr. W. G. Downing,* and *Mr. Jesse B. Roote,* for Appellant.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

Edward B. Trueman was convicted of the crime of manslaughter and appeals from the judgment, and from an order denying him a new trial. The defendant killed James McCabe on election day, November 4, 1904, near a polling place at Sedan, Flathead county. He was tried at the February term of court, 1905, but the jury failed to agree upon a verdict, was discharged and the cause continued until the May term of the same year, when it was tried a second time. Upon the second trial the defendant entered a plea of once in jeopardy in addition to his plea of not guilty, which had been interposed before the first trial. There had been a long-standing difficulty between deceased and defendant, other personal encounters between them had occurred, and each had made threats against the other.

1. A witness, Yeiser, testified to a threat made by the defendant in 1900. He testified that he was near the defendant's place; that defendant came up, with a rifle leveled at the witness, to within about twenty feet from where the witness was standing, and said: "I will get you sons-of-bitches yet." When asked how he knew that McCabe was meant, he answered: "Because my neighbors had told me previously." This was ob-

jected to upon the ground that it was hearsay, and a motion to strike it out was made. The objection was in effect overruled and the motion to strike out was denied. The testimony, so far as it related to McCabe, was clearly hearsay and inadmissible. The witness did not pretend that McCabe's name was mentioned at all by the defendant, and there is nothing in the record whatever to show that McCabe was intended to be included in the class referred to by the defendant. The mere fact that the witness said: "I know he meant James McCabe and myself and Frank Addeman," does not alter the situation, for he had testified that the reason he knew that McCabe was intended to be included was because his neighbors had told him so.

The rule of law with reference to the reception of testimony of previous threats by the defendant is stated in 21 Encyclopedia of Law, second edition, 220, as follows: "The rule as generally laid down is that threats to be admissible must indicate a purpose to do some particular person an injury, or must be expressions of ill-will or hate against a class of which the deceased is one, and must be capable of such construction as to show reference to the deceased."

2. Fred. Strodbeck, a witness for the state, testified that he and McCabe went to Sedan together on the day of the homicide, and told generally of their movements. On cross-examination he stated that he and McCabe went to Sedan and voted before they had anything to drink (meaning intoxicating liquors). On cross-examination he was asked to state whether or not they had anything to drink that day, but, on objection by counsel for the state, he was not permitted to answer. This ruling was erroneous. It was proper cross-examination, for the purpose of showing whether the witness was in such a condition of sobriety as to be likely to remember what occurred, and as tending to shed light upon McCabe's action. The contention of the defendant was that McCabe was the aggressor, and was killed by Trueman in self-defense.

3. The witness Roddy, for the state, testified at great length with reference to circumstances preceding and attending the

homicide; that McCabe came up to where witness and Trueman were standing, came up behind Trueman and struck him over the shoulder with an ax-handle. On cross-examination he was asked to state whether or not he saw McCabe carrying that ax-handle around during that day. This was objected to by counsel for the state as not proper cross-examination, and the objection was sustained. This was also error. It was not only proper cross-examination, but tended directly to sustain the defendant's contention that McCabe sought the encounter and had prepared himself for it. There is no dispute in the evidence that McCabe not only had the ax-handle, but had a loaded revolver in his coat pocket, at the time he was killed. The testimony also tends to show that he had purchased this ax-handle during the forenoon, some considerable time before the homicide. The mere fact that the evidence sought to be elicited by the question was in a sense cumulative does not cure the error. The jury might not have believed the other witnesses and might have believed the witness Roddy.

4. A witness, Alexander, testified for the defendant that he was a clerk of election at Sedan on the day of the homicide; that he saw McCabe, and that McCabe appeared to have been drinking. He was then asked to state whether he noticed that the drinking affected McCabe's conduct. This was objected to on the ground that it called for the conclusion of the witness. The objection was sustained, and error is predicated upon this ruling. The ruling was erroneous. In *Hardy* v. *Merrill*, 56 N. H. 227, 22 Am. Rep. 442, it is said: "But without reference to any recognized rule or principle, all concede the admissibility of the opinions of nonprofessional men upon a great variety of unscientific questions arising every day, and in every judicial inquiry. These are questions of identity, handwriting, quantity, value, weight, measure, time, distance, velocity, form, size, age, strength, heat, cold, sickness, and health; questions, also, concerning various mental and moral aspects of humanity, such as disposition and temper, anger, fear, excitement, *intoxication*, veracity, general character, and particular phases of character, and

other conditions and things, both moral and physical, too numerous to mention." The correctness of this rule is settled beyond controversy. (*People* v. *Sehorn*, 116 Cal. 503, 48 Pac. 495; *State* v. *Dolan*, 17 Wash. 499, 50 Pac. 472; 3 Wigmore on Evidence, sec. 1977; 17 Cyc. 91.)

5. Thomas D. Long, an attorney, was employed by Mrs. McCabe, relict of James McCabe, the deceased, to assist in the prosecution, and from the record it appears that he assumed the role of leading counsel for the state and did most of the work of interrogating witnesses at the trial. During the course of the trial Mr. Long's conduct became the subject of many protests from counsel for the defendant, and it is urged that the district court abused its discretion in permitting him to continue in the case, and that his conduct was such as to prevent the defendant from having a fair trial. There may be some question as to whether these matters are properly presented in the record. This we do not determine. The matters are discussed as though properly before us, except that the attorney general contends that the objection to privately employed counsel appearing for the state should have been made before or at the time the trial commenced.

The court compelled the state to call as one of its witnesses, Frank Roddy, as the only living eye-witness to the homicide except the defendant. Roddy appeared to be hostile to the state and friendly to the defendant. His testimony was very strongly in the defendant's favor. Almost as soon as he was called to the witness-stand, there apparently developed a very bitter feeling of hostility between the witness and Mr. Long, who was interrogating him on behalf of the state. The witness was exasperating in his conduct toward the attorney, was extremely impertinent in his replies, and merited severe punishment by the court; but, instead of controlling the conduct of the case and requiring that the trial should be conducted in an orderly and decorous manner, the court seemingly permitted counsel and witness to violate almost every propriety of the courtroom with very mild rebukes, when any were administered. The court

should have controlled the witness or should have punished him for contempt. But while the conduct of the witness was exasperating in the extreme, it did not furnish any provocation for the conduct of Mr. Long.

As illustrative of that conduct, it appears that soon after the witness was called to the witness-stand he was asked a question to which counsel for the defendant made an objection. Mr. Long said: "You compelled us to put this witness on." Mr. Downing for the defendant, said: "The court compelled you." Mr. Long replied: "We don't vouch for this witness. He is yours. We don't think he can tell the truth." Later, the witness was asked a question to which he answered that he could not tell, and Mr. Long then propounded to him this question: "Q. Are you *non compos mentis?* Do you know anything at all?" It became a question as to which of two buildings the witness Roddy was near when the homicide was committed. He was asked a number of questions respecting this matter, and why he gave a different answer at the first trial from that given at the second. In explaining his answer he said to Mr. Long: "You told me you was positive it [referring to a particular building] was the building"; to which Mr. Long replied: "I wish to say that the witness unqualifiedly lies." In answer to one of Mr. Long's questions the witness said that at the former trial counsel had abused him, and called him a "self-deluded fool that knew nothing," to which Mr. Long replied: "And I think that." Again the witness was interrogated with reference to the two buildings mentioned before, and he repeated to Mr. Long that Mr. Long had told him that he was positive one building was the particular one near which Roddy was standing, to which Mr. Long replied: "I told you once this morning what I thought of you, and tell you now that you unqualifiedly lie."

On behalf of the state Mr. Long sought to get before the jury the fact that the deceased had left surviving him a wife and a small child. He proved this fact, over the objection of the defendant, by a witness, Eugene McCabe; but afterward, on

motion of counsel for the defendant, the court struck out all testimony relating to the family of the deceased. Thereupon Mr. Long immediately called Mrs. James McCabe as a witness, asked her a few questions relating to wholly immaterial matters, and, by questions evidently asked for that purpose, again got before the jury the fact that the deceased had left surviving him a wife and baby. Upon objection by counsel for the defendant and on motion, this testimony was stricken out, Mr. Long consenting that the answer to the last question he had asked should be stricken out.

Misconduct of a prosecuting officer of the character shown above has quite uniformly been held sufficient to require a reversal of a judgment of conviction in the comparatively few instances where such misconduct has been manifested. It is the duty of the prosecuting officer to see that the defendant has a fair trial, and that he is convicted, if at all, only upon competent evidence, and to this end it is peculiarly incumbent upon the prosecuting officer to be fair and impartial. (12 Cyc. 571.) It is highly improper for him to ask questions which he knows, or has reason to believe, the court will not permit to be answered; and when the court has indicated its decision by a ruling, counsel should respect it. In *State* v. *Rogers,* 31 Mont. 1, 77 Pac. 293, this court reversed a judgment of conviction, because the county attorney asked a witness for the defendant certain improper questions which tended to degrade and discredit the witness.

If the prosecuting officer did not wish the witness' statements to go unchallenged, he might have become a witness, and in a proper manner have denied them; but his abuse of the witness while acting as prosecuting officer was so extreme that it cannot be justified, and, when properly presented, such misconduct will always work a reversal of a judgment of conviction. (12 Cyc. 576, and cases cited.) "It is the right of a witness to be protected from irrelevant, improper or insulting questions, and from harsh or insulting demeanor; to be detained only so long as the interests of justice require it; to be examined only

as to matters legal and pertinent to the issue.'' (Code Civ. Proc., sec. 3402.)

While these acts of misconduct did not pass wholly unnoticed by the court, they were not treated as they should have been, and the very leniency of the court might have been misunderstood by the jury to defendant's prejudice.

Error is predicated upon the refusal or failure of the court to require the jury to return a verdict upon the defendant's plea of former jeopardy. But we do not think this was error of which the defendant can complain. Had the court submitted the question to the jury for a verdict, it would have been compelled to instruct the jury to return such verdict in favor of the state upon that issue under the decision of this court in *State* v. *Keerl,* 33 Mont. 501, 85 Pac. 862, decided February 19th of this year, and opinion on motion for rehearing, filed April 30, 1906.

The judgment and order are reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE MILBURN concur.