STATE, RESPONDENT, *v.* SATTERFIELD, APPELLANT.
(No. 8348.)

(Submitted November 19, 1942. Decided January 5, 1943.)

[132 Pac. (2d) 372.]

*Mr. David J. Ryan,* for Appellant, submitted a brief.

*Mr. R. V. Bottomly,* Attorney General, *Mr. Fred Lay,* First Assistant Attorney General, *Mr. John D. Stafford,* County Attorney, and *Mr. R. J. Nelson,* Assistant County Attorney, for the State, submitted a brief; *Mr. Lay* argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

Defendant appeals from his conviction of second degree assault and from an order denying his motion for. a new trial. The information charged first degree assault and the court gave instructions on assault in both the first and second degrees.

The case was submitted to the jury mainly on the conflicting testimony of Richard Warner, the prosecuting witness, and S. P. Satterfield, the defendant, who were sheep herders living in a cabin two miles from the nearest neighbor. The defendant admits that, using his rifle as a club, he inflicted severe injuries upon the prosecuting witness with the rifle barrel, including several cuts on the left side of the head, a slight concussion of the brain, and a broken bone in the left forearm. The trouble apparently resulted from defendant's failure to open the door for Warner, who was outside in weather about twenty below zero with his arms full of firewood. The evidence differed somewhat as to the early part of the dispute, but whatever the facts were in that regard, defendant's testimony shows that finally, while defendant was sitting on his bed, Warner left that end of the cabin, went across and sat down on his own bed; that Warner was talking loudly and wildly, "was mad and just looked at me and I said, 'You better quiet down, quiet down.' He said 'I will shoot it out with you' and he grabbed for his gun;" that defendant took his own gun and in self-defense hit Warner "a little lick * * * not enough to knock him down. He threw up his hand and I hit him on top of his gun. * * * I think I might have hit him another little lick. He said, 'Quit, you will beat my brains out.' I said, 'Get away from that gun or I will beat your brains out,' * * * I picked up his gun and ejected the shells out.'' Finally he testified that when the last two blows were given Warner was lying on his face on the bed with his gun under him, but he did not know whether Warner was then holding the gun or not.

Warner's version of the incident was that the defendant had fired at him before Warner went across to his own side of the

room; that his gun was under his mattress and that he was sitting on his bed removing his overshoes; that he threatened to call the sheriff, and the defendant shot at him again and then "swung the gun with all his might" and hit him; that he fell over on the bed, putting up his arm in time to receive the second blow; that "blood was coming out here in streaks and all over my bed, so he sat and glared at me for awhile, and he came over to me and stuck his rifle between my eyes, and had his finger on the trigger and he said, 'I am going to kill you,' I didn't dare to move. He said, 'If you move one inch I will let you have it.' I was laying on my back in bed then bleeding, and finally he came closer and he had the gun in between my eyes. He says, 'Where is that old gun of yours?' He said, 'Speak up or I will kill you,' and I managed to speak up and I said, 'It is under the mattress,' so when he had his gun between my eyes he leaned over me and with one hand dragged forth my rifle. He took it and turned around and went toward the door and fired one shot out of it toward the door and takes all the other shells out. That is all. * * * I remember, I said, 'You got to help me, I am bleeding to death.' He said, 'That is all right, go ahead and bleed to death,' and I can't recall any more. About two-thirty o'clock the next morning I came to. * * * For one thing I was almost froze to death. The door was standing open so I was almost froze. I was afraid to get up that I couldn't get back into bed. I laid there a couple of hours and finally I got up and closed the door. I finally got up to stir up the fire and I couldn't until about daylight.'' The incident happened about seven o'clock on the evening of January 2, 1942.

Cottet, a witness who worked on a ranch two miles away, testified that at eight o'clock that evening defendant rapped on the door and asked to use the telephone to tell his employer about some sheep being sick, but that they could not get the call through; that defendant then tried unsuccessfully to borrow a horse; that he was nervous, picked up his rifle and went out twice during the conversation, finally said that he

had hurt another sheep herder in a quarrel, and added something to the effect that he did not care if he did kill him.

Defendant then walked to Belt, twelve miles away, arriving at midnight, stayed at a hotel that night and took the bus to Raynesford next morning, where he reported the incident to his employers. They then went to the cabin, picking up a deputy sheriff at Belt en route. No complete examination but only a superficial one was then made for bullet holes in the cabin, as it took some time to get Warner in from where he was herding the sheep, and to build a fire, heat water and clean and dress his wounds. They had arrived at the cabin about 1:30 or 2:00 o'clock p. m., and stayed only about an hour or an hour and a half, being in a hurry to get away because the roads were bad and they had been forced to leave their car and go the last two miles by sleigh.

Defendant denied Warner's version, including the shooting, and when asked if he had made the statement to Cottet would say nothing more definite than "I don't think I did," the same reply which he made when questioned concerning other statements he was alleged to have made.

One of the defendant's employers testified that while he was having lunch on February 4th he made an examination for bullet holes and was unable to find any; that the place was then apparently the same as in December before the trouble, except for a broken window, and that it was still the same a week before the trial.

The state was then allowed to reopen its case to introduce the ▆▆ testimony of the deputy sheriff, Gus Thorson, and of Walker B. Carroll, city-county identification officer, over the defendant's objection that the evidence was too remote. These officers testified to finding certain bullet holes in the ceiling and floor of the cabin on the preceding day. They testified that the calibre of the bullets might be about thirty or thirty-two, and that they might have come from "a gun of that kind," but refused to express an opinion as to when the holes were made except that it was not during the last thirty days.

The objection that evidence is too remote is directed to the discretion of the court and is a matter that goes to the credibility of the evidence rather than to its admissibility (22 C. J. S., Criminal Law, p. 997, sec. 638; 20 Am. Jur. 234, sec. 249; *People* v. *McCurdy*, 68 Cal. 576, 10 Pac. 207; *People* v. *Arrangoiz*, 24 Cal. App. (2d) 116, 74 Pac. (2d) 789), unless the remoteness is so great that the proffered evidence has no evidentiary value. (*State* v. *Pemberton*, 39 Mont. 530, 104 Pac. 556; *People* v. *Boggess*, 194 Cal. 212, 228 Pac. 448.)

If there were error in admitting the evidence, it cannot have prejudiced the defendant. Whether or not any shots were fired, defendant's testimony constituted an admission that he had assaulted Warner with an instrument likely to produce grievous bodily harm, and with it had inflicted grievous bodily harm upon him, thus committing at least second degree assault (sec. 10977, Rev. Codes) if his action was wilful and wrongful. Thus the question to be determined by the jury was the latter phase, upon which the testimony concerning the bullet holes had no bearing, since if he had sufficient reason to fear a rifle attack by Warner he had the right to defend himself by suitable means, and the jury was so instructed. By its verdict the jury found, and was entitled to find upon the disputed evidence, that the assault by defendant was not in self-defense nor otherwise justified.

Defendant complains of the court's refusal to give three ▮ offered instructions relative to self-defense, but we find no error in the court's action, as the matter of the offered instructions was substantially the same as that given in the court's 9th and 17th instructions, which correctly and adequately cover the subject.

Defendant also complains that the court erred in failing to ▮ give an instruction on third degree assault, but the record does not disclose any request for such instruction, and, as pointed out above, the facts constituted at least a second degree assault or no offense at all.

Defendant's final specification of error is that the court erred

in denying his motion for a new trial, but the only grounds which are argued are the ones above considered.

Finding no reversible error, the judgment and the order denying a new trial are affirmed.

ASSOCIATE JUSTICES ERICKSON, MORRIS and ANDERSON concur.