No. 79-26

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

---

THE STATE OF MONTANA,

     Plaintiff and Respondent,

  -vs-

JEAN SORENSON,

     Defendant and Appellant.

---

Appeal from: District Court of the Second Judicial District,
      In and for the County of Silver Bow,
      The Honorable Arnold Olsen, Judge presiding.

Counsel of Record:

  For Appellant:

    M. F. Hennessey and Leonard J. Haxby, Butte,
    Montana
    M. F. Hennessey argued, Butte, Montana

  For Respondent:

    Hon. Mike Greely, Attorney General, Helena, Montana
    Chris Tweeten and Mike McGrath argued, Assistant
    Attorney Generals, Helena, Montana
    John G. Winston, County Attorney, Butte, Montana
    Michael Wheat argued, Deputy County Attorney, Butte,
    Montana

---

      Submitted: September 16, 1980

       Decided: NOV 2 4 1980

Filed: NOV 2 4 1980

*Thomas J. Kearney*
      Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Jean Sorenson appeals her conviction of deliberate homicide and aggravated assault in the District Court of the Second Judicial District, County of Silver Bow, the Honorable Arnold Olsen presiding. We affirm.

On December 6, 1978, the State filed an information charging the defendant, Jean Sorenson, with one count of mitigated deliberate homicide and one count of aggravated assault. On May 4, 1979, forty-five days prior to trial, the State moved the trial court for leave to amend the information. The motion was granted. The amended information changed the charge of mitigated deliberate homicide to deliberate homicide and retained the charge of aggravated assault.

Defendant was convicted of one count of deliberate homicide and one count of aggravated assault following a jury trial. The court sentenced defendant to serve twenty-four years' imprisonment on the homicide count and twelve years' imprisonment on the aggravated assault count, the terms to run concurrently.

Defendant Sorenson owns and operates the Stockman Bar in Butte, Montana. On November 9, 1978, at approximately 11:45 p.m., Gerald Lojeski, Sam Pernell and Steven Sims entered and ordered a round of beers. Defendant refused to serve them and ordered them to leave the bar. Sims left, but Lojeski and Pernell did not. An argument ensued, during which defendant procured a handgun from behind the bar, pointed it in the direction of Lojeski and Pernell, and fired three shots. One bullet struck Pernell in the shoulder. Another struck Lojeski in the face, killing him instantly.

Defendant maintained she fired in self-defense. She claimed she had refused to serve Lojeski, Pernell and Sims because they were loud and belligerent. According to defendant, Lojeski became angry and asked if she had refused them service because Pernell was a black man. She testified that she threatened to call the police and that Lojeski thereupon threatened to "kick the s___ out of [her]." She then moved down the bar and secured a handgun, and, pointing it at Lojeski and Pernell, ordered them to leave. At that time, Sorenson contended, the victims attempted to slap or strike her, and Pernell threatened to "'whup [her] ass.'" She testified she was afraid the victims would "come over the bar," so she started shooting. Defendant denied having any intent to kill or injure anyone.

The State presented testimony from three bartenders and a bar patron, all of whom had dealt with Lojeski, Pernell, and Sims prior to their arrival at the Stockman Bar, and all of whom testified that the three men had not been loud, belligerent, or aggressive.

Defendant's testimony also contrasts markedly with the testimony of three eyewitnesses. Darrell Halvorson, a truck driver and himself a former bartender, was seated at the bar within a few feet of defendant, Lojeski and Pernell. He testified that the altercation between Sorenson and the victims was not serious, that it was a typical barroom argument "with a lot of cussing and swearing on both sides." Halvorson stated that Lojeski and Pernell had been drinking but did not appear to be overly aggressive until Sorenson became abusive towards them. According to Halvorson, Sorenson called Pernell a "f_____' nigger c___ s_____." It was then that the argument heated up. Halvorson testified

that neither of the two men at any time punched or slapped at defendant; nor had either ever attempted to "come over the bar." At no time, according to Halvorson, did the two men place defendant in danger of death or serious bodily injury. In his opinion, it was not at all necessary to use a gun to eject the men from the premises.

Two Montana Tech students, Greg LaClaire and Pat Rollins, were seated at the opposite end of the bar from Halvorson. Their testimony substantially corroborated his. LaClaire testified that the victims were "loose" but not loud when they entered the bar. He stated that Sorenson called Pernell "a m_____ f_____ and a c___ s_____" and told him "to lick his b____." He also testified that the argument between Sorenson and the victims never became physical and that the victims never attempted to "climb the bar."

Rollins testified that Sorenson started the argument, that she used profanity against the victims the whole time they were in the bar, and that most of the profanity was directed at Pernell. He maintained that neither man threatened Sorenson, and that neither "climbed the bar" nor attempted to strike Sorenson. Rollins testified, moreover, that neither was in a position to strike her. Neither Lojeski nor Pernell had brandished a weapon of any kind. He identified Sorenson as the aggressor in the confrontation. According to Rollins, the argument heated up as the result of defendant's profanity.

Both LaClaire and Rollins testified that Sorenson walked from the north end of the bar, where the confrontation with the victims took place, to the south end of the bar, where the two students were seated, to procure the gun. Both LaClaire and Rollins had worked as bartenders and

bouncers. Rollins was 6'2" tall and weighed 215 pounds. Instead of remaining at the south end of the bar with the two students, where she certainly would have been safe from any supposed danger posed by Lojeski and Pernell, defendant returned with the gun to the north end of the bar.

Pernell testified that defendant then stationed herself directly in front of him but far enough away so that he could not have grabbed or struck her even if he had tried. Pernell insisted that neither he nor Lojeski made the slightest effort to harm defendant and that when the shots were fired, defendant was in no danger of death or serious bodily injury. His testimony is corroborated by the absence of blood on the bar separating defendant from the victims, as well as by the testimony of forensic expert Donald Reedman. Based on the pattern of powder burns on Pernell's clothing, Reedman testified that the defendant was probably four and one-half to five feet from the victims when the shots were fired.

LaClaire testified that, after procuring the handgun, Sorenson told the victims to get out but then "almost instantaneously" started shooting. Rollins testified that defendant fired no warning shots first. Based on their personal bartending experiences, Halvorson and the two student witnesses all testified, in essence, that the barroom altercation posed no threat of imminent danger to Sorenson which would make it necessary for her to defend herself.

Sorenson raises the following issues on appeal:

1. Did the trial court err in granting the State's motion to amend the information changing the charge of mitigated deliberate homicide to deliberate homicide?

2. Did the trial court err in granting the State's motion in limine to exclude reference to marijuana use by the victims and witnesses twelve hours prior to the shooting?

3. Did the trial court err in giving Instruction Nos. 27 and 28 dealing with the use of force in self-defense by an aggressor and an aggressor's duty to withdraw?

4. Did the trial court err in refusing to instruct the jury concerning the defense of an occupied structure?

5. Was there sufficient evidence to support the verdict?

In her first assignment of error defendant essentially argues that the information was violative of both the statutory mandates of section 46-11-403, MCA, and of the constitutional guarantees of 1972 Mont. Const., Art. II, §20, and of the due process clauses of the state and federal constitutions. Her argument has three parts, each of which will be discussed separately.

A. Statutory Argument.

In her original brief, defendant pursues mainly a statutory argument. She relies on this Court's holding in State v. Hallam (1978), 175 Mont. 492, 575 P.2d 55, that amendments subsequent to pleading are allowed only as to matters of form and only when no substantial rights of the defendant are prejudiced. She contends that the lower court erred in allowing an amendment of substance after she pleaded on the original information.

Defendant's reliance on Hallam is, however, misplaced. That case construed the numerical predecessor to section 46-11-403, MCA, prior to its amendment in 1977. Prior to 1977, subsection (1) of the statute permitted amendments of substance only prior to pleading. The 1977 amendment removed that limitation, allowing substantive amendments without

-6-

leave of the court at any time not less than five days before trial. The procedural safeguards governing substantive amendments of criminal informations are hereafter declared by this Court's holding in State v. Cardwell (1980), ___ Mont. ___, 609 P.2d 1230, 37 St.Rep. 750, and not by Hallam.

B. Burden Shifting.

In its brief in support of its motion to amend the information, the State listed, as one justification for increasing the degree of the offense charged, the fact that defendant had failed to supply the State with the names of witnesses who would justify retaining the lesser offense of mitigated deliberate homicide. As a result, defendant contends that the State has attempted to shift its burden of proving that defendant committed mitigated deliberate homicide to her. She relies on In Re Winship (1970), 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375.

Defendant's argument that the State unconstitutionally shifted its burden of proving an element of mitigated deliberate homicide to her is unfounded. The burden-shifting rationale was developed by the United States Supreme Court in Mullaney v. Wilbur (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508, and In Re Winship, supra. Mullaney invalidated a rule of Maine law that a defendant must, to reduce a homicide charge to manslaughter, bear the burden of proving by a fair preponderance of the evidence that he acted "in the heat of passion on sudden provocation." The case held that a necessary element of murder, malice, may not be presumed, thereby relieving the State of the burden of proving every element of the crime beyond a reasonable doubt. The Supreme Court applied the same principle in

_Winship_ to invalidate a New York statute providing that, for a juvenile to be found guilty of an act which would constitute a crime if committed by an adult, the State need prove guilt only by a preponderance of the evidence.

Mullaney v. Wilbur, supra, does not support defendant's position. In 1977 the United States Supreme Court, distinguishing _Mullaney_, held that a New York law requiring that the defendant in a prosecution for second-degree murder prove by a preponderance of the evidence the affirmative defense of extreme emotional disturbance to reduce the offense to manslaughter did not violate the due process clause. Patterson v. New York (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281. The Court held that a State is not required to prove the nonexistence of every fact which it is willing to recognize as an exculpatory or mitigating circumstance affecting the degree of culpability or the severity of the punishment. 432 U.S. at 207-209, 97 S.Ct. 2319, 53 L.Ed.2d 281. The due process clause does not put the states to a choice between abandoning affirmative defenses "or undertaking to disprove their existence in order to convict of a crime which otherwise is within its constitutional powers to sanction . . ." 432 U.S. at 208, 97 S.Ct. 2319, 53 L.Ed.2d 281.

The _Patterson_ Court noted that _Mullaney_ was distinguishable because the Maine law which _Mullaney_ invalidated presumed malice, a requisite element of murder, if the defendant did not prove mitigating circumstances. 432 U.S. at 215-216, 97 S.Ct. 2319, 53 L.Ed.2d 286. In summary, _Patterson_ stands for the proposition that a state may require a criminal defendant to prove mitigating circumstance when this circumstance constitutes a defense rather than

-8-

essential elements of the offense. As the Annotator's Note
to section 45-3-115, MCA, provides:

> " There does not seem to be any federal consti-
> tutional problem in establishing a burden
> greater than a 'reasonable doubt' since the
> U.S. Supreme Court has indicated that a state
> need not allow any affirmative defenses at all.
> Patterson v. New York (1977), 432 U.S. 197.
> And, where it chooses to allow such defenses,
> the State may regulate the burden of producing
> evidence and the burden of persuasion as long
> as it does not thereby shift to the defendant
> its own burden of proof as to each of the ele-
> ments of the offense beyond a reasonable doubt.
> Id. The Supreme Court has even held that an
> Oregon statute, which required the defendant
> to prove the defense of insanity beyond a rea-
> sonable doubt, was not violative of due pro-
> cess. Leland v. Oregon (1952), 343 U.S. 790."

C. Cardwell Argument.

After defendant filed her original brief, this Court
decided State v. Cardwell (1980), ___ Mont. ____, 609 P.2d
1230, 37 St.Rep. 750. In that case, this Court held that
section 46-11-403, MCA, allowing substantive amendments
without leave of court, is unconstitutional under 1972 Mont.
Const., Art. II, §20. Furthermore, the Court held that the
constitution requires judicial supervision of the informa-
tion throughout the course of prosecution and that a sub-
stantive change in the information may only be made in
compliance with certain procedural safeguards. Cardwell,
609 P.2d at 1233. In her reply brief, defendant contends
that the Cardwell holding applies to this case. Her argu-
ment is twofold.

Initially, Sorenson contends that the retroactive
application of the Cardwell rule is not at issue. She
argues that Cardwell applies directly to the present case
for essentially three reasons: (1) Cardwell's trial occurred
before the Sorenson trial; (2) the defendant has consis-
tently contended that the State's amendment of the informa-

tion was unconstitutional as applied to her (she contends that the State impermissibly put the burden on her to justify retaining the charge of mitigated deliberate homicide or see the charge increased to deliberate homicide); and (3) defendant contends that the doctrine of retroactive application, as announced by State v. Campbell (1979), ____ Mont. ____, 597 P.2d 1146, 1149, 37 St.Rep. 1264, applies only to new, court-created rules, not to statutes which have been declared unconstitutional.

In the alternative defendant argues that if retroactivity is an issue, then, pursuant to the three-pronged test of State v. Campbell, supra, the equities favor the retroactive application of the Cardwell holding in this case.

Cardwell represents this Court's view that leave of court to amend an information will fully protect the criminal defendant's rights under 1972 Mont. Const., Art. II, §20. Cardwell identifies two interests protected by that constitutional provision. The first is the requirement that the information be supported by probable cause at all stages of the proceeding. 609 P.2d at 1233. The second interest is the requirement, rooted in the due process clause, that defendant have notice of the charge and an opportunity to prepare a defense. 609 P.2d at 1233. To protect these interests, Cardwell establishes three procedural safeguards that must be complied with before a substantive amendment to an information is allowed: (1) the amended information must be approved by the District Court; (2) the defendant must have adequate notice of the charge and an opportunity to prepare for trial; and (3) the defendant "should" be re-arraigned on the new charge. 609 P.2d at 1233.

The record in the instant case shows that these three procedural prerequisites to substantive amendments of informations have been met:

(1) Here, although section 46-11-403(1), MCA, did not facially require it, the prosecution sought and received leave of the trial court before it filed the amended information. On May 4, 1979, the State filed a motion to amend the information accompanied by a brief in support of the motion. A hearing was held on the motion on May 11, 1979, at which defendant was represented by counsel. By its order of May 25, 1979, the trial court granted the motion to amend.

(2) Defendant clearly had adequate notice and adequate time to prepare her defense. The motion to amend was filed on May 4, 1979, some forty-five days prior to the beginning of trial on June 18, 1979. Furthermore, the amended information did not change the substantive elements of the charge. The State has the burden of proving the same elements under both mitigated deliberate homicide and deliberate homicide. The amended information continued to allege that defendant purposely or knowingly killed Gerald Lojeski. Defendant has not demonstrated how any of her substantial rights were prejudiced; nor has defendant explained how she was unfairly surprised or rendered incapable of preparing a defense by the trial court's leave to amend the information. See State v. Stewart (1973), 161 Mont. 501, 505, 507 P.2d 1050. If defendant felt she had an inadequate opportunity to prepare an adequate defense, she could have requested a continuance.

-11-

(3) A minute entry of the District Court dated June 11, 1979, clearly shows that defendant was rearraigned under the amended information.

Because the leave of court was granted, the procedural safeguards of Cardwell were substantially complied with and defendant was not prejudiced by the existence of a procedural statute which was later ruled unconstitutional. Since she was not injured by the statute, defendant has no standing to argue for the retroactive application of the Cardwell rule.

We find no merit in defendant's first assignment of error.

In her second issue defendant contends that the trial court erred in prohibiting the defense from referring to the use of marijuana by Pernell, Sims, and Lojeski while en route to Butte by bus at a rest stop in Idaho, some twelve hours before the shooting. Defendant's arguments are largely speculative and conclusory.

Defendant asserts that the excluded evidence is "extremely relevant" to the question of the fundamental testimonial credibility of the State's two primary witnesses, Pernell and Sims. Defendant argues that much of the testimony that these men gave at trial related to events taking place on the bus to Butte while they were "undeniably" under the influence of both alcohol and marijuana, which could have colored their perception of those events. Defendant insists that this is an "obvious defect" in their credibility that should have been brought to the attention of the jury. Defendant also speculates that the witnesses could have again used drugs after their arrival in Butte and could have been in a "drug-induced stupor" when they entered the Stockman Bar.

-12-

Defendant also implies that the excluded evidence was relevant to the "central issue" of her case, presumably her theory of self-defense. This contention seems to be premised on an assumption that the smoking of marijuana would be likely to produce aggressive tendencies.

The District Court excluded any mention of the use of marijuana by Pernell, Sims and Lojeski twelve hours before the shooting on the grounds of remoteness.

In State v. Gleim (1895), 17 Mont. 17, 31, 41 P. 998, this Court stated that the mere use of narcotics is not admissible to impeach witness credibility "unless it is proposed to show that the witness was under the influence of the drugs at the time the events happened about which she testified." Defendant has laid no foundation tending to show that the witnesses were under the influence of drugs at the time of the events in question. She merely assumes that they were and that their behavior was adversely affected. Defendant has, therefore, failed to make the requisite showing under Gleim.

Evidence that a witness was intoxicated is admissible on cross-examination to impeach the witness's ability to accurately perceive the events about which he has testified. Herzig v. Sandberg (1918), 54 Mont. 538, 540, 172 P. 132, 133; State v. Trueman (1906), 34 Mont. 249, 252, 85 P. 1024, 1025. Evolving a satisfactory rule for cases in which the witness uses drugs is considerably more difficult, however. Although the psychological effects of alcohol usage are far from clear, much less is known about the effect of drugs. The multiplicity of drugs and the varying reactions they cause have compounded the difficulties.

Only a minority of state courts has adopted a blanket rule of admissibility. Note, 1966 Utah L. Rev. 742, 743; see also Annot., 52 A.L.R.2d 848 (1957). Those courts allow evidence of drug usage, without requiring proof that the witness's testimentary capacities were impaired, usually on the theory that a user of drugs is a liar. That is, however, a theory of impeachment which seemingly rests more on the witness's character than on his mental capacity. Such a theory would now be governed by Rule 608, Mont.R.Evid.

The majority of state courts has adopted the sounder rule that evidence of drug usage is not permitted "unless it can also be proved that the use of narcotics has impaired the sensory, retentive, or communicative ~~facilities~~ faculties of the witness." Note, 1966 Utah L. Rev. 742, 743.

The federal courts, operating under the Federal Rules of Evidence upon which Montana's rules are based, have endorsed a variety of approaches. See generally, 3 Weinstein's Evidence, §607[04] (1978). There does not seem to be a clear consensus in the federal system.

State v. Gleim, supra, indicates that Montana has endorsed the majority rule requiring a showing that drug usage has impaired the witness's facilities before evidence of the witness's use of the drug is admissible. Implicit in the formulation of the rule in Gleim (drug use is inadmissible unless it is shown that the witness was under the influence of drugs at the time the events about which he testifies occurred) is a recognition of the concept of remoteness. Here, the trial judge ruled that the smoking of marijuana was too remote in time to be admitted. The question of remoteness is directed to the discretion of the trial court. State v. Fitzpatrick (1980), ___ Mont. ___,

606 P.2d 1343, 1355, 37 St.Rep. 194; State v. Satterfield (1943), 114 Mont. 122, 127, 132 P.2d 372. While remoteness is a matter that generally goes to the credibility of the evidence rather than to its admissibility, Satterfield, supra, evidence can be excluded if it is so remote that it has no evidentiary value. Satterfield, supra; State v. Pemberton (1909), 39 Mont. 530, 535, 104 P. 556. Given defendant's failure to lay a proper foundation that the witnesses were under the influence of drugs at the time of the material events in this case, exclusion of the evidence was justified both under the Gleim rule and under the remoteness doctrine.

The District Court did not err in granting the State's motion in limine.

Defendant next urges that the trial court erred in giving the following instructions dealing with an aggressor's use of force in self-defense and an aggressor's duty to withdraw.

Instruction No. 27, to which defendant objects, reads:

"You are instructed that the use of force in defense of a person is not available to a person who purposely or knowingly provokes the use of force against himself unless such force is so great that he reasonably believes that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or serious bodily harm to the assailant."

Defendant also objects to Instruction No. 28:

"You are instructed that the use of force in defense of person is not available to a person who purposely or knowingly provokes the use of force against himself unless in good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force but the assailant continues or resumes the use of force."

Defendant presents essentially a two-pronged argument. First, there is insufficient evidence to justify giving Instruction Nos. 27 and 28. Defendant points selectively to evidence in the record which, standing alone, supports her contention that she was not the aggressor. She emphasizes the fact that she is a 71-year-old woman. She contends that she was suddenly confronted by three drunk men in her business. When she refused to serve them alcohol, as she was legally obligated to do under section 16-3-301(2), MCA, she contends that the men subjected her to threats of physical violence. Second, defendant contends that the instructions were abstract and incomplete statements of the law. Defendant argues that a person must have the specific intent of becoming an aggressor before he or she may be deprived of the right of self-defense on the ground of provocation.

Section 45-3-105(2), MCA, provides that self-defense is not available to a person who:

"(2) purposely or knowingly provokes the use of force against himself, unless:

"(a) such force is so great that he reasonably believes that he is in imminent danger of death or serious bodily harm and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or serious bodily harm to the assailant; or

"(b) in good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force but the assailant continues or resumes the use of force."

In State v. Buckley (1976), 171 Mont. 238, 242, 557 P.2d 283, this Court held that "the district court's instructions must cover every issue or theory having support in the evidence, and the inquiry of the district court must only be whether or not any evidence exists in the record to warrant

an instruction . . ." Sufficient evidence is clearly present in the record to support the State's theory that defendant was the aggressor in her confrontation with the victims.

The evidence justifies giving Instruction Nos. 27 and 28. A person can become an aggressor if he or she purposely or knowingly provokes the victim verbally. The jury was instructed on the requisite mental state in both Instruction Nos. 27 and 28.

As her fourth issue, Sorenson urges that the trial court erred in refusing her proffered instructions concerning the defense of an occupied structure.

Section 45-3-103, MCA, defines the justifiable use of force in defense of an occupied structure:

> "A person is justified in the use of force or threat to use force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon an occupied structure. However, he is justified in the use of force likely to cause death or serious bodily harm only if:
>
> "(1) the entry is made or attempted in violent, riotous, or tumultuous manner and he reasonably believes that such force is necessary to prevent an assault upon or offer of personal violence to him or another then in the occupied structure; or
>
> "(2) he reasonably believes that such force is necessary to prevent the commission of a forcible felony in the occupied structure."

This section is derived from Illinois which has substantially the same statute. Ill. C.C. 1961, Title 38, §7-2.

Before the statute is applicable, Illinois case law requires that the entry must be unlawful; hence, the defendant may not assert justification where the victims enter upon the premises lawfully but subsequently engages in unlawful conduct for which the occupant of the dwelling seeks to expel the victim. People v. Chapman (1977), 49

-17-

Ill.App.3d 553, 364 N.E.2d 577; People v. Brown (1974), 19 Ill.App.3d 757, 312 N.E.2d 789; see generally, Annotator's Note, Montana Criminal Code Annotated 131-132 (rev. 1980).

Sorenson's claim is that once she had ordered these customers out of her bar, and they refused to go, then their continued presence in the bar became an unlawful entry into an occupied structure. Based on that syllogism, she maintains she was entitled to instructions based on section 45-3-103, MCA.

By its terms, this section only applies to efforts of a defendant to prevent or terminate an unlawful *entry* into occupied premises. It has no application to a lawful entry into premises. On the evidence here, without doubt, the shooting did not occur while Sorenson was attempting to prevent or terminate an entry into her premises. No error occurred when the District Court refused instructions based upon this section.

No authority has been found and none was cited by defendant that a "tumultuous entry" into a tavern makes the entry unlawful. The trial court properly refused defendant's proferred instructions on defense of an occupied structure since there was no evidence that the entry was unlawful or an attack upon the structure.

Finally, Sorenson contends that the verdict is not supported by sufficient evidence. The contention is frivolous. Defendant merely asserts in a conclusory fashion that the cause of the shooting was the victims' insistence on being served liquor, that the shooting of the victims was entirely justified even when the evidence is viewed in the light most favorable to the State, and that she was under extreme stress which mitigated the crime.

The jury is not bound to blindly accept defendant's version of the facts. It is free to pick and choose the evidence it wishes to believe. State v. Seitzinger (1979), ____ Mont. ____, 589 P.2d 655, 658, 36 St.Rep. 122, 125; State v. Fitzpatrick (1973), 163 Mont. 220, 226, 516 P.2d 605. The jury chose to believe the State's witnesses, not Sorenson.

The verdict is supported by sufficient evidence.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

_____
Honorable John M. McCarvel,
District Judge, sitting in
place of Mr. Justice Daniel Shea.

-19-